Filed 8/18/11

# IN THE SUPREME COURT OF CALIFORNIA

REBECCA HOWELL,                              )
                                             )
    Plaintiff and Appellant,             )
                                             )                  S179115
    v.                                   )
                                             )           Ct.App. 4/1 D053620
HAMILTON MEATS & PROVISIONS,                 )
INC.,                                        )
                                             )           San Diego County
    Defendant and Respondent.            )      Super. Ct. No. GIN053925
_____)

      When a tortiously injured person receives medical care for his or her injuries, the provider of that care often accepts as full payment, pursuant to a preexisting contract with the injured person's health insurer, an amount less than that stated in the provider's bill.  In that circumstance, may the injured person recover from the tortfeasor, as economic damages for past medical expenses, the undiscounted sum stated in the provider's bill but never paid by or on behalf of the injured person?  We hold no such recovery is allowed, for the simple reason that the injured plaintiff did not suffer any economic loss in that amount.  (See Civ. Code, §§ 3281 [damages are awarded to compensate for detriment suffered], 3282 [detriment is a loss or harm to person or property].)

      The collateral source rule, which precludes deduction of compensation the plaintiff has received from sources independent of the tortfeasor from damages the plaintiff "would otherwise collect from the tortfeasor" (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 (*Helfend*)), ensures that plaintiff here may

1

recover in damages the amounts her insurer paid for her medical care. The rule, however, has no bearing on amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment. Such sums are not damages the plaintiff would otherwise have collected from the defendant. They are neither paid to the providers on the plaintiff's behalf nor paid to the plaintiff in indemnity of his or her expenses. Because they do not represent an economic loss for the plaintiff, they are not recoverable in the first instance. The collateral source rule precludes certain deductions against otherwise recoverable damages, but does not expand the scope of economic damages to include expenses the plaintiff never incurred.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Rebecca Howell was seriously injured in an automobile accident negligently caused by a driver for defendant Hamilton Meats & Provisions, Inc. (Hamilton). At trial, Hamilton conceded liability and the necessity of the medical treatment plaintiff had received, contesting only the amounts of plaintiff's economic and noneconomic damages.

Hamilton moved in limine to exclude evidence of medical bills that neither plaintiff nor her health insurer, PacifiCare, had paid. Hamilton asserted that PacifiCare payment records indicated significant amounts of the bills from plaintiff's health care providers (the physicians who treated her and Scripps Memorial Hospital Encinitas, where she was treated) had been adjusted downward before payment pursuant to agreements between those providers and PacifiCare and that, under plaintiff's preferred provider organization (PPO) policy with

2

PacificCare, plaintiff could not be billed for the balance of the original bills (beyond the amounts of agreed patient copayments). Relying primarily on *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635 (*Hanif*),[1] Hamilton argued that because only the amounts paid by plaintiff and her insurer could be recovered, the larger amounts billed by the providers were irrelevant and should be excluded. The trial court denied the motion, ruling that plaintiff could present her full medical bills to the jury and any reduction to reflect payment of reduced amounts would be handled through "a posttrial *Hanif* motion."

Plaintiff's surgeon and her husband each testified that the total amount billed for her medical care up to the time of trial was $189,978.63, and the jury returned a verdict awarding that same amount as damages for plaintiff's past medical expenses.

Hamilton then made a "post-trial motion to reduce past medical specials pursuant to [*Hanif*]," seeking a reduction of $130,286.90, the amount assertedly "written off" by plaintiff's medical care providers, Scripps Memorial Hospital Encinitas (Scripps) and CORE Orthopaedic Medical Center (CORE). In support of the motion, Hamilton submitted billing and payment records from the providers and two declarations, the first by Scripps's collections supervisor, the second by an employee of CORE's billing contractor. The Scripps declaration stated that of

---

[1] In *Hanif*, the plaintiff introduced evidence that the reasonable value of the medical services he received was greater than the amount Medi-Cal had paid on his behalf, and the trial court awarded him the greater sum. (*Hanif, supra*, 200 Cal.App.3d at p. 639.) The appellate court held this was error, for "when the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care despite the fact it may have been less than the prevailing market rate." (*Id.* at p. 641.)

3

the $122,841 billed for plaintiff's surgeries, PacifiCare paid $24,380, plaintiff paid $3,566, and the remaining $94,894 was " 'written off' or waived by [Scripps] pursuant to the agreement between [Scripps] and the patient's private healthcare insurer, in this case Pacificare PPO." The CORE declaration stated that of the surgeon's bill for $52,915, PacifiCare paid $9,665, and $35,392 was waived or written off pursuant to CORE's agreement with PacifiCare.[2] Both declarants stated the providers had not filed liens for, and would not pursue collection of, the written-off amounts.

In opposition, plaintiff argued reduction of the medical damages would violate the collateral source rule. She supported her opposition with copies of the patient agreements she had signed with Scripps, in which she agreed to pay Scripps's "usual and customary charges" for the medical care she was to receive, and with CORE, in which she agreed to pay any part of the physician's fee her insurance did not pay.

The trial court granted Hamilton's motion, reducing the past medical damages award "to reflect the amount the medical providers accepted as payment in full." Accordingly, the court reduced the judgment by $130,286.90.

The Court of Appeal reversed the reduction order, holding it violated the collateral source rule. Because it viewed the reduction of the award as substantively improper, the Court of Appeal did not resolve plaintiff's additional

---

[2] For simplicity, we have rounded these amounts to the nearest dollar, leading to a $1 discrepancy in the Scripps total. The $7,858 difference between the total CORE bill and the sum of the PacifiCare payments and write-offs is not explained in the CORE declaration.

contentions that the procedures used in the trial court were statutorily unauthorized and the evidence Hamilton presented was insufficient.

We granted Hamilton's petition for review.

DISCUSSION

Compensatory damages are moneys paid to compensate a person who "suffers detriment from the unlawful act or omission of another" (Civ. Code, § 3281), and the measure of damages generally recoverable in tort is "the amount which will compensate for all the detriment proximately caused" by the tort (*id.*, § 3333). Civil Code section 3282, in turn, defines "detriment" as "a loss or harm suffered in person or property." A person who undergoes necessary medical treatment for tortiously caused injuries suffers an economic loss by taking on liability for the costs of treatment. Hence, any reasonable charges for treatment the injured person has paid or, having incurred, still owes the medical provider are recoverable as economic damages. (See *Melone v. Sierra Railway Co.* (1907) 151 Cal. 113, 115 [plaintiff is entitled to "[s]uch reasonable sum . . . as has been necessarily expended or incurred in treating the injury"].)

When, as here, the costs of medical treatment are paid in whole or in part by a third party unconnected to the defendant, the collateral source rule is implicated. The collateral source rule states that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend*, *supra*, 2 Cal.3d at p. 6.) Put another way, "Payments made to or benefits conferred on the injured party from other sources [i.e., those unconnected to the defendant] are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." (Rest.2d Torts, § 920A, subd. (2).) The rule thus dictates that

5

an injured plaintiff may recover from the tortfeasor money an insurer has paid to medical providers on his or her behalf.

*Helfend*, like the present case, involved a health insurer's payments to medical providers on the plaintiff's behalf. In these circumstances, we explained, the collateral source rule ensures plaintiffs will receive the benefits of their decision to carry insurance and thereby encourages them to do so. (*Helfend*, *supra*, 2 Cal.3d at pp. 9-10.) Since insurance policies frequently allow the insurer to reclaim the benefits paid out of a tort recovery by refund or subrogation, the rule, without providing the plaintiff a double recovery, ensures the tortfeasor cannot "avoid payment of full compensation for the injury inflicted . . . ." (*Id.* at p. 10.)

In *Helfend*, we addressed a challenge to the continued acceptance of the collateral source rule. After considering the rule's operation and consequences, we rejected that challenge, concluding that "in the context of the entire American approach to the law of torts and damages, . . . the rule presently performs a number of legitimate and even indispensable functions." (*Helfend*, *supra*, 2 Cal.3d at p. 13.) *Helfend* did not, however, call on this court to consider *how* the collateral source rule would apply to damages for past medical expenses when the amount billed for medical services substantially exceeds the amount accepted in full payment. While *Helfend* unequivocally reaffirmed California's acceptance of the rule, it did not explain how the rule would operate in the circumstances of the present case.

The collateral source rule has an evidentiary as well as a substantive aspect. Because a collateral payment may not be used to reduce recoverable damages, evidence of such a payment is inadmissible for that purpose. Even if relevant on another issue (for example, to support a defense claim of malingering), under Evidence Code section 352 the probative value of a collateral payment must be

6

"carefully weigh[ed] . . . against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations." (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 732.) Admission of evidence of collateral payments may be reversible error even if accompanied by a limiting instruction directing the jurors not to deduct the payments from their award of economic damages. (*Id.* at pp. 729, 734.)

The Legislature has abrogated or altered the collateral source rule for two classes of actions. First, in a professional negligence action against a health care provider, the defendant may introduce evidence of collateral payments and benefits provided to the plaintiff for his or her injury; the plaintiff, in turn, may introduce evidence of premiums paid or contributions made to secure the benefits. (Civ. Code, § 3333.1, subd. (a).) Second, a public entity defendant may move, after trial, to reduce a personal injury award against it by the amount of certain collateral source payments. (Gov. Code, § 985, subd. (b).) The trial court has discretion to reduce the judgment, though its discretion is guided and limited in several respects, including that the total deduction may not exceed one-half of the plaintiff's net recovery. (*Id.*, subd. (g).) Neither statute applies here.

The California history of the substantive question at issue—whether recovery of medical damages is limited to the amounts providers actually are paid or extends to the amounts of their undiscounted bills—begins with *Hanif*, *supra*, 200 Cal.App.3d 635.

The injured plaintiff in *Hanif* was a Medi-Cal recipient,[3] and the amounts Medi-Cal paid for his medical care were, according to his evidence, substantially

_____

[3]     Medi-Cal is California's implementation of the federal Medicaid program. (See *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 804.) The amounts paid by Medicaid programs are "usually, if not always" less than a provider's ordinary charges. (*Id.* at p. 820.)

7

lower than the "reasonable value" of the treatment (apparently the same as the hospital bill, as the opinion notes the hospital had " 'written off' " the difference). (*Hanif*, *supra*, 200 Cal.App.3d at p. 639.) Although there was no evidence the plaintiff was liable for the difference, the court in a bench trial awarded the plaintiff the larger, "reasonable value" amount. (*Ibid.*) The appellate court held the trial court had overcompensated the plaintiff for his past medical expenses; recovery should have been limited to the amount Medi-Cal had actually paid on his behalf. (*Id.* at pp. 639, 643-644.) The court ordered the judgment modified to reflect the proper reduction. (*Id.* at p. 646.)

*Hanif*'s rationale was straightforward. While California courts have referred to the "reasonable value" of medical care in delineating the measure of recoverable damages for medical expenses, in this context " '[r]easonable value' is a term of limitation, not of aggrandizement." (*Hanif*, *supra*, 200 Cal.App.3d at p. 641.) The "detriment" the plaintiff suffered (Civ. Code, § 3281), his pecuniary "loss" (*id.*, § 3282), was only what Medi-Cal had paid on his behalf; to award more was to place him in a better financial position than before the tort was committed. (*Hanif*, at pp. 640-641.) A tort plaintiff's recovery for medical expenses, the *Hanif* court opined, is limited to the amount "paid or incurred for past medical care and services, whether by the plaintiff or by an independent source . . . ." (*Id.* at p. 641.)

We cited *Hanif*'s holding with approval in *Olszewski v. Scripps Health*, *supra*, 30 Cal.4th 798, in which we held California's provider lien statute (Welf. & Inst. Code, § 14124.791) was preempted by federal law and invalid as applied to a Medi-Cal beneficiary's tort recovery. In so doing, we observed that because a provider's lien for its full fees was not permissible, pursuant to *Hanif* the Medi-Cal beneficiary may recover as damages from the tortfeasor only the amount payable to the provider under Medi-Cal. (*Id.* at pp. 826-827.)

In *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298 (*Nishihama*), the Court of Appeal applied *Hanif*'s rationale to payments made by a private health insurer. The jury awarded the injured plaintiff $17,168 for her hospital expenses, an amount based on the hospital's "normal rates." (*Id.* at p. 306.) The record, however, showed the plaintiff participated in a health plan administered by Blue Cross, which had an agreement with the hospital pursuant to which the hospital had accepted $3,600 in full payment for its services to the plaintiff. (*Id.* at pp. 306-307.) Relying on *Hanif*'s holding that only the amount actually paid or incurred is recoverable as compensation for medical expenses, and rejecting the plaintiff's argument that the hospital might take a larger sum (its normal rate) out of her recovery under a lien it had filed,[4] the *Nishihama* court ordered the judgment reduced to reflect only the amount the hospital had received from Blue Cross. (*Nishihama*, at pp. 306-309.)

This court subsequently reached the same conclusion in *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 598, holding the hospital could not assert a lien against a patient's tort recovery for its full bill when it had agreed to accept an insurer's lesser reimbursement as full payment. At the same time, however, we reserved judgment on whether *Hanif*, *supra*, 200 Cal.App.3d 635, and *Olszewski v. Scripps Health*, *supra*, 30 Cal.4th 798, "apply outside the Medicaid context and limit a patient's tort recovery for medical expenses to the amount actually paid . . . ." (*Parnell*, at pp. 611-612, fn. 16.)

---

[4]     The appellate court held that under the Hospital Lien Act (Civ. Code, §§ 3045.1-3045.6) the hospital's lien rights "do not extend beyond the amount it agreed to receive from Blue Cross as payment in full for services provided to plaintiff." (*Nishihama*, *supra*, 93 Cal.App.4th at p. 307.)

9

*Hanif* and *Nishihama* were distinguished in *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288. There, although the injured plaintiffs' medical providers had sold some of their bills at a discount to a medical finance company, the plaintiffs remained liable to the finance company for the original amounts of the bills. (*Id.* at pp. 1290-1291.) The appellate court concluded the trial court, in limiting recovery to the discounted amounts, "did not correctly apply *Hanif* and *Nishihama.* The intervention of a third party in purchasing a medical lien does not prevent a plaintiff from recovering the amounts billed by the medical provider for care and treatment, *as long as the plaintiff legitimately incurs those expenses and remains liable for their payment.*" (*Id.* at p. 1291, italics added.)

None of the above decisions discussed the question, central to the arguments in this case, of whether restricting recovery to amounts actually paid by a plaintiff or on his or her behalf contravenes the collateral source rule. These arguments, although extensive, can be reduced to a few central disputed issues: (1) Was *Hanif* correct that a tort plaintiff can recover only what has been paid or incurred for medical care, even if that is less than the reasonable value of the services rendered? (2) Even if *Hanif*, which involved Medi-Cal payments, reached the right result on its facts, does its logic extend to plaintiffs covered by private insurance? (3) Does limiting the plaintiff's recovery to the amounts paid and owed on his or her behalf confer a windfall on the tortfeasor, defeating the policy goals of the collateral source rule? (4) Is the difference between the providers' full billings and the amounts they have agreed to accept from a patient's insurer as full payment—what the appellate court below called the "negotiated rate differential"—a benefit the patient receives from his or her health insurance policy subject to the collateral source rule? We address these questions below.

10

## A. *Hanif* and the Measure of Damages for Past Medical Expenses

We agree with the *Hanif* court that a plaintiff may recover as economic damages *no more* than the reasonable value of the medical services received and is not entitled to recover the reasonable value if his or her actual loss was less. (*Hanif*, *supra*, 200 Cal.App.3d at p. 641.) California decisions have focused on "reasonable value" in the context of *limiting* recovery to reasonable expenditures, not expanding recovery beyond the plaintiff's actual loss or liability. To be recoverable, a medical expense must be both incurred *and* reasonable. (See *Melone v. Sierra Railway Co.*, *supra*, 151 Cal. at p. 115 [proper measure of damages for medical expenses is "[s]uch reasonable sum . . . *as has been necessarily expended or incurred* in treating the injury" (italics added)]; *Townsend v. Keith* (1917) 34 Cal.App. 564, 566 [trial court's failure to instruct the jury "to limit its finding to the reasonable value of *the expenses incurred*" did not prejudice defendant, as the expenses incurred were, on their face, not unreasonable (italics added)].)

The rule that a plaintiff's expenses, to be recoverable, must be both incurred *and* reasonable accords, as well, with our damages statutes. "Damages must, in all cases, be reasonable . . . ." (Civ. Code, § 3359.) But if the plaintiff negotiates a discount and thereby receives services for less than might reasonably be charged, the plaintiff has not suffered a pecuniary loss or other detriment in the greater amount and therefore cannot recover damages for that amount. (*Id*., §§ 3281, 3282.) The same rule applies when a collateral source, such as the plaintiff's health insurer, has obtained a discount for its payments on the plaintiff's behalf.

The Restatement rule is to the same effect. While the measure of recovery for the costs of services a third party renders is ordinarily the reasonable value of those services, "[*i*]*f . . . the injured person paid less than the exchange rate, he can*

11

*recover no more than the amount paid*, except when the low rate was intended as a gift to him." (Rest.2d Torts, § 911, com. h, pp. 476-477, italics added.)

Plaintiff argues section 911 of the Restatement is irrelevant, as it deals only with the wrongful taking of services and damage to property. Not so. Section 911 articulates a rule, applicable to recovery of tort damages generally, that the value of property or services is ordinarily its "exchange value," that is, its market value or the amount for which it could usually be exchanged. Comment h to section 911, on the "[*v*]*alue of services rendered*," applies, inter alia, to services the plaintiff must purchase from third parties as a result of the tort, noting that if the plaintiff obtains these for less than the exchange value, only the amount paid may be recovered. The expenses of medical care, although not specifically mentioned, are logically included in the rule articulated. Thus the general rule under the Restatement, as well as California law, is that a personal injury plaintiff may recover *the lesser* of (a) the amount paid or incurred for medical services, and (b) the reasonable value of the services.

Contrary to the view of the dissent (dis. opn., *post*, at pp. 10-11), section 924 of the Restatement, which provides that a tort plaintiff may recover "reasonable medical and other expenses," expresses no different principle. (Rest.2d Torts, § 924.) To be recoverable as "expenses," monies must generally have been expended, or at least incurred; that they must also be reasonable does not alter this general rule.[5]

---

[5] The reporter's note for section 924 (Rest.2d Torts (appen.) § 924, reporter's notes, p. 445) cites in support of its rule, among other cases, *Birmingham Amusement Co. v. Norris* (Ala. 1927) 112 So. 633, which stated, quoting an earlier Alabama case, that " '[w]hile it is true that the defendant is not liable for any more than the reasonable value of the services of a physician, yet neither is it liable for

*(footnote continued on next page)*

**B.** *Hanif* **and Private Health Insurance**

Plaintiff contends *Hanif*'s limitation on recovery, even if correct as to Medi-Cal recipients, does not logically apply to plaintiffs, like her, with private medical insurance. The appellate court below agreed, reasoning that "Howell, who was privately insured, incurred personal liability for her medical providers' usual and customary charges," whereas the plaintiff in *Hanif* "incurred no personal liability for the medical charges billed to Medi-Cal." Observing that *Hanif* stated the measure of recovery for medical expenses was the amounts actually "paid or incurred" (*Hanif*, *supra*, 200 Cal.App.3d at p. 641), plaintiff argues she *incurred* liability for the full amount of Scripps's and CORE's bills when she signed patient agreements with those providers and accepted their services.

We find the distinction unpersuasive. Evidence presented at the posttrial hearing showed Scripps and CORE accepted the discounted amounts as full payment pursuant to preexisting agreements with PacifiCare, plaintiff's managed care plan. Since those agreements were in place when plaintiff sought medical care from the providers and signed the patient agreements, her prospective liability was limited to the amounts PacifiCare had agreed to pay the providers for the services they were to render. Plaintiff cannot meaningfully be said ever to have incurred the full charges. (See *Parnell v. Adventist Health System/West*, *supra*, 35 Cal.4th at p. 609 [where hospital had agreed with plaintiff's health plan to accept

---

*(footnote continued from previous page)*

any more than has actually been paid or is due. *So it is necessary to prove both . . . .' "* (*Id.* at p. 636, italics added.) Comment f to section 924, on which the dissent relies (dis. opn., *post*, at p. 11), notes the exception for donated medical services (discussed further below) but does not suggest that recovery for medical expenses may otherwise generally exceed the amount reasonably paid or incurred. (Rest.2d Torts, § 924, com. f, pp. 526-527.)

13

discounted amounts as payment in full, plaintiff owed hospital nothing beyond those discounted payments]; cf. *People v. Bergin* (2008) 167 Cal.App.4th 1166, 1170 [for purposes of Pen. Code § 1202.4, subd. (f)(3), requiring restitution in the amount of the "economic loss incurred," crime victim incurred loss only in the amount medical provider accepted as payment from private insurer].) In this respect, plaintiff here was in the same position as the *Hanif* plaintiff, who also bore no personal liability for the providers' charges. This is not a case like *Katiuzhinsky v. Perry*, *supra*, 152 Cal.App.4th at page 1296, where the plaintiffs "remain[ed] fully liable for the amount of the medical provider's charges for care and treatment."

*Hanif* noted one exception to its rule, viz., for medical services that are gratuitously provided or discounted, an exception included in the Restatement section on which the court relied (Rest.2d Torts, § 911, com. h, pp. 476-477). (See *Hanif*, *supra*, 200 Cal.App.3d at p. 643 [no evidence the low rate charged Medi-Cal "was intended as a gift to the plaintiff"].) The question arises whether this exception, if accepted, limits *Hanif*'s logic in a manner important to the present issue. That is, if a plaintiff, as the Restatement provides, may recover the reasonable value of donated medical services—services for which neither the plaintiff nor the plaintiff's insurer paid—should a plaintiff also be permitted to recover other amounts that were not paid but were reasonably billed by the provider, including the negotiated rate differential? If the amount of a gratuitous discount would be considered a collateral source payment, should the amount of a negotiated discount be treated in the same way?

The Restatement reflects the widely held view that the collateral source rule applies to gratuitous payments and services. (Rest.2d Torts, § 920A, com. c, subd. (3), p. 515 ["Thus the fact that the doctor did not charge for his services or the plaintiff was treated in a veterans hospital does not prevent his recovery for the

14

reasonable value of the services."]; see also Rest.2d Torts, § 924, com. f, pp. 526-527.)  California law is less clear on the point.  In *Helfend*, we suggested in dictum that the collateral source rule applies to unpaid services only when those are rendered "with the expectation of repayment out of any tort recovery."  (*Helfend*, *supra*, 2 Cal.3d at p. 7, fn. 5.)  But in *Arambula v. Wells* (1999) 72 Cal.App.4th 1006, the Court of Appeal declined to follow this dictum, finding it inconsistent with other California cases, the law of sister states, and the policy of encouraging charitable action:  "We doubt such gifts would continue if, notwithstanding a donor's desire to aid the injured, the person who caused the injury ultimately stood to gain a windfall.  Donors should not have to consult with a lawyer to make sure their largesse is not hijacked by the tortfeasor."  (*Id.* at p. 1013.)  Thus, although in *Arambula* the injured plaintiff's employer had continued to pay his salary, the appellate court held the jury should have been permitted to award damages for lost earnings.  (*Id.* at pp. 1008-1009, 1016.)  This court has neither approved nor disapproved *Arambula*'s holding, nor does this case require that we do so.

Assuming California follows the Restatement's view that a plaintiff may recover the value of donated services under the collateral source rule, this exception to *Hanif*'s limitation on recovery does not, we believe, militate against applying *Hanif*'s rule—that only amounts paid or incurred are recoverable—to medical expenses paid by the plaintiff's insurer.  Medical providers that agree to accept discounted payments by managed care organizations or other health insurers as full payment for a patient's care do so not as a gift to the patient or insurer, but for commercial reasons and as a result of negotiations.  As plaintiff herself explains, hospitals and medical groups obtain commercial benefits from their agreements with health insurance organizations; the agreements guarantee the providers prompt payment of the agreed rates and often have financial incentives for plan members to choose the providers' services.  (See *Stanley v.*

*Walker* (Ind. 2009) 906 N.E.2d 852, 863-864 (dis. opn. of Dickson, J.) [detailing administrative and marketing advantages medical providers derive from managed care agreements, particularly those with preferred provider plans].)  That plaintiffs are not permitted to recover undiscounted amounts from those who have injured them creates no danger these negotiations and agreements will disappear; the medical provider has no financial reason to care whether the tortfeasor is charged with or the plaintiff recovers the negotiated rate differential.  Having agreed to accept the negotiated amount as full payment, a provider may not recover any difference between that and the billed amount through a lien on the tort recovery. (*Parnell v. Adventist Health System/West*, *supra*, 35 Cal.4th at p. 598.)

In jurisdictions where donated services are considered to fall within the collateral source rule, the plaintiff is presumably entitled to recover the reasonable value of the services even though he or she did not incur liability in that amount. The dissent argues that to limit the recovery of a plaintiff with medical insurance, such as Howell, to the amounts paid or incurred is anomalous, given that he or she could have recovered a hypothetically larger reasonable value had the services been gratuitously provided.  (Dis. opn., *post*, at p. 6.)  We see no anomaly, even assuming we would recognize the gratuitous-services exception to the rule limiting recovery to the plaintiff's economic loss.  The rationale for that exception—an incentive to charitable aid (*Arambula v. Wells*, *supra*, 72 Cal.App.4th at p. 1013)—has, as just explained, no application to commercially negotiated price agreements like those between medical providers and health insurers.  Nor, as discussed below, does the tort-law policy of avoiding a windfall to the tortfeasor

16

suggest the necessity of treating the negotiated rate differential as if it were a gratuitous payment by the medical provider.[6] (See pt. C, *post*.)

The dissent's repeated description of the negotiated rate differential as a *write-off* from the provider's bill illustrates the confusion between negotiated prices and gratuitous provision of medical services. (See dis. opn., *post*, at pp. 2, 5, 7, 12.) Where a plaintiff has incurred liability for the billed cost of services and the provider later "writes off" part of the bill because, for example, the plaintiff is unable to pay the full charge, one might argue that the amount of the write-off constitutes a gratuitous benefit the plaintiff is entitled to recover under the collateral source rule. But in cases like that at bench, the medical provider has agreed, before treating the plaintiff, to accept a certain amount in exchange for its services. That amount constitutes the provider's price, which the plaintiff and health insurer are obligated to pay without any write-off. There is no need to determine a reasonable value of the services, as there is in the case of services gratuitously provided. "[W]here, as here, the exact amount of expenses has been established by contract and those expenses have been satisfied, there is no longer any issue as to the amount of expenses for which the plaintiff will be liable. In the latter case, the injured party should be limited to recovering the amount paid for

---

6    The dissent also argues that since an *uninsured* plaintiff would be entitled to recover the reasonable value of medical services received, an insured plaintiff like Howell should be entitled to the same. The dissent's premise is erroneous; a plaintiff who lacks health insurance would *not* be entitled to recover the reasonable value of the medical services if that amount exceeded the liability he or she incurred for the services. The rule that medical expenses, to be recoverable, must be both incurred *and* reasonable (Civ. Code, §§ 3281, 3282, 3359; *Melone v. Sierra Railway Co.*, *supra*, 151 Cal. at p. 115) applies equally to those with and without medical insurance.

the medical services." (*Moorhead v. Crozer Chester Medical Center* (Pa. 2001) 765 A.2d 786, 789.)

### C.  Windfall to the Tortfeasor

Nor does the tortfeasor obtain a "windfall" (*Arambula v. Wells*, *supra*, 72 Cal.App.4th at p. 1013) merely because the injured person's health insurer has negotiated a favorable rate of payment with the person's medical provider.  When an injured plaintiff has received collateral compensation or benefits as a gift, allowing a deduction from damages in that amount would result in a windfall for the tortfeasor and underpayment for the injury.  Because the tortfeasor would not pay the full cost of his or her negligence or wrongdoing, the deduction would distort the deterrent function of tort law.  (See Katz, *Too Much of a Good Thing: When Charitable Gifts Augment Victim Compensation* (2003) 53 DePaul L.Rev. 547, 564  [if a charitable gift to the plaintiff reduces the tort recovery, the defendant "pays less than the full social costs of his conduct and is underdeterred"].)  Analogously, if it were established a medical provider's full bill generally represents the value of the services provided, and the discounted price negotiated with the insurer is an artificially low fraction of that true value, one could make a parallel argument that relieving the defendant of paying the full bill would result in underdeterrence.  The complexities of contemporary pricing and reimbursement patterns for medical providers, however, do not support such a generalization.  We briefly explore those complexities below.

A 2005 study of hospital cost setting conducted for the Medicare Payment Advisory Commission concluded:  "Hospital charge setting practices are complex and varied.  Hospitals are generally faced with competing objectives of balancing budgets, remaining competitive, complying with health care and regulatory standards, and continuing to offer needed services to the community. . . .

18

[¶] Disparities between charges and costs [have] been growing over time as many existing charges were set before hospitals had a good idea of their costs and/or were set in response to budgetary and competitive considerations rather than resource consumption.  Hospital charges are set within the context of hospitals' broader communities, including their competitors, payers, regulators, and customers. . . .  These competing influences and hospitals' efforts to address them often produce charges which may not relate systematically to costs."  (Dobson et al., A Study of Hospital Charge Setting Practices (2005) p. v, <http://www.medpac.gov/documents/Dec05_Charge_setting.pdf> (as of Aug. 18, 2011).)

The rise of managed care organizations, which typically restrict payments for services to their members, has reportedly led to increases in the prices charged to uninsured patients, who do not benefit from providers' contracts with the plans.  As one article explains:  "Before managed care, hospitals billed insured and uninsured patients similarly.  In 1960, 'there were no discounts; everyone paid the same rates'—usually cost plus ten percent.  But as some insurers demanded deep discounting, hospitals vigorously shifted costs to patients with less clout."  (Hall & Schneider, *Patients as Consumers:  Courts, Contracts, and the New Medical Marketplace* (2008) 106 Mich. L.Rev. 643, 663, fns. omitted (hereafter *Patients as Consumers*).)  As a consequence, "only uninsured, self-paying U.S. patients have been billed the full charges listed in hospitals' inflated chargemasters,"[7] so that a

---

[7]    A hospital charge description master, or chargemaster, is "a uniform schedule of charges represented by the hospital as its gross billed charge for a given service or item, regardless of payer type."  (Health & Saf. Code, § 1339.51, subd. (b)(1).)  California hospitals are required to make their chargemasters public

*(footnote continued on next page)*

family might find itself "paying off over many years a hospital bill of, say, $30,000 for a procedure that Medicaid would have reimbursed at only $6,000 and commercial insurers somewhere in between."  (Reinhardt, *The Pricing of U.S. Hospital Services:  Chaos Behind a Veil of Secrecy* (2006) 25 Health Affairs 57, 62 (hereafter *The Pricing of U.S. Hospital Services*).)  Some physicians, too, have reportedly shifted costs to the uninsured, resulting in significant disparities between charges to uninsured patients and those with private insurance or public medical benefits.  (*Patients as Consumers*, at pp. 661-663.)

Nor do the chargemaster rates (see fn. 7, *ante*) necessarily represent the amount an uninsured patient will pay.  In California, medical providers are expressly authorized to offer the uninsured discounts, and hospitals in particular are required to maintain a discounted payment policy for patients with high medical costs who are at or below 350 percent of the federal poverty level.  (Bus. & Prof. Code, § 657, subd. (c); Health & Saf. Code, § 127405, subd. (a)(1)(A).)  Nationally, "many hospitals now have means-tested discounts off their chargemasters for uninsured patients, which bring the prices charged the uninsured closer to those paid by commercial insurers or even below."  (*The Pricing of U.S. Hospital Services*, *supra*, 25 Health Affairs at p. 62.)  Because so many patients, insured, uninsured, and recipients under government health care programs, pay discounted rates, hospital bills have been called "insincere, in the sense that they would yield truly enormous profits if those prices were actually paid."  (*Id.* at p. 63.)

---

*(footnote continued from previous page)*

and to file them with the Office of Statewide Health Planning and Development. (*Id.*, §§ 1339.51, subds. (a)(1), (b)(3), 1339.55, subd. (a).)

We do not suggest hospital bills always exceed the reasonable value of the services provided. Chargemaster prices for a given service can vary tremendously, sometimes by a factor of five or more, from hospital to hospital in California. (See *The Pricing of U.S. Hospital Services*, *supra*, 25 Health Affairs at p. 58, exhibit No. 1 [prices for a chest x-ray at selected California hospitals, showing low of around $200 and high of around $1,500].)[8] With so much variation, making any broad generalization about the relationship between the value or cost of medical services and the amounts providers bill for them—other than that the relationship is not always a close one—would be perilous.

Finally, private health insurers are well equipped to conduct sophisticated arm's-length price negotiations, whereas patients individually suffer inherent disadvantages that significantly impede negotiating prices with medical care providers: difficulty in gathering information, lack of choice and bargaining power, and possible physical and emotional disabilities relating to the injury or illness. (See *Patients as Consumers*, *supra*, 106 Mich. L.Rev. at pp. 648-659.) If we seek, then, the exchange value of medical services the injured plaintiff has been required to obtain (see Rest.2d Torts, § 911 & com. h, pp. 476-477), looking to the negotiated prices providers accept from insurers makes at least as much sense, and arguably more, than relying on chargemaster prices that are not the result of direct negotiation between buyer and seller. For this reason as well, it is

---

[8] Hospitals' chargemaster prices can be accessed on the Web site of the Office of Statewide Health Planning and Development at <http://www.oshpd.ca.gov/Chargemaster> (as of Aug. 18, 2011). Updating Reinhardt's 2004 survey using 2010 data, one finds the listed price for a two-view chest x-ray was $176 at San Francisco General Hospital and $1,390 at Doctors Medical Center of Modesto.

21

not possible to say generally that providers' full bills represent the real value of their services, nor that the discounted payments they accept from private insurers are mere arbitrary reductions. Accordingly, a tortfeasor who pays only the discounted amount as damages does not generally receive a windfall and is not generally underdeterred from engaging in risky conduct.

The dissent argues that unless the insured plaintiff is permitted to recover the reasonable value or "market value" of the medical services, the tortfeasor will not pay the full cost of its negligence, "distort[ing] the deterrent function of tort law." (Dis. opn., *post*, at pp. 1, 5.) But as discussed above, pricing of medical services is highly complex and depends, to a significant extent, on the identity of the payer. In effect, there appears to be not one market for medical services but several, with the price of services depending on the category of payer and sometimes on the particular government or business entity paying for the services. Given this state of medical economics, how a market value other than that produced by negotiation between the insurer and the provider could be identified is unclear.[9]

The dissent's proposal that the insured plaintiff recover the "reasonable value" of his or her care, to be proven in each case by expert testimony (dis. opn., *post*, at pp. 1, 12-14), is also troubling because it would routinely involve

---

[9] The Restatement (Rest.2d Torts, § 911, com. h, p. 476) notes the "customary rate" for services governs tort recovery "[i]f the services are rendered in a business or profession in which there is a rate for them definitely established by custom . . . ." But how may such a rate be determined when the "custom" is to bill for medical services at chargemaster rates that are paid by relatively few patients and to discount those rates to varying degrees for various government, insurance, and individual payers according to a complex system of regulation and negotiation?

22

violations of the evidentiary aspect of the collateral source rule. If the jury were required to decide whether the price actually paid for medical care was lower than reasonable, the defense could not in fairness be precluded from showing the circumstances by which that price was determined, including that it was negotiated and paid by the plaintiff's health insurer. In contrast, our conclusion, that the plaintiff may recover no more than the medical providers accepted in full payment for their services, allows for proof of the amount paid without admitting evidence of the payment's source. (See p. 28, *post*.)

### D. The Negotiated Rate Differential as Insurance Benefit

If the negotiated rate differential is not a gratuitous payment by the provider to the injured plaintiff (recoverable, at least in the Restatement's view, under the collateral source rule), nor an arbitrary reduction (arguably recoverable to prevent a defense windfall and underdeterrence), is it, as plaintiff contends and the Court of Appeal held, recoverable as a benefit provided to the insured plaintiff under her policy? Plaintiff contends the negotiated rate differential represents the monetary value of the administrative and marketing advantages a provider obtains through its agreement with the insurer. Having incurred liability for the full price of her medical care, plaintiff maintains, she then received the benefit of having her insurer extinguish that obligation through a combination of cash payments and noncash consideration in the amount of the negotiated rate differential. Both parts of this consideration being benefits accruing to her under her policy, for which she paid premiums, both parts should assertedly be recoverable under the collateral source rule.

We disagree. As previously discussed, plaintiff did not incur liability for her providers' full bills, because at the time the charges were incurred the providers had already agreed on a different price schedule for PacifiCare's PPO

23

members.  (See *Parnell v. Adventist Health System/West*, *supra*, 35 Cal.4th at p. 609.)  Having never incurred the full bill, plaintiff could not recover it in damages for economic loss.  For this reason alone, the collateral source rule would be inapplicable.  The rule provides that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the *damages which the plaintiff would otherwise collect from the tortfeasor*." (*Helfend*, *supra*, 2 Cal.3d at p. 6, italics added.)  The rule does not speak to losses or liabilities the plaintiff did not incur and would not otherwise be entitled to recover.  As was explained by an Oregon justice, "The collateral source doctrine does not address the amount of damages that a plaintiff can recover in the first instance." (*White v. Jubitz Corp.* (Or. 2009) 219 P.3d 566, 584 (dis. opn. of Kistler, J.); see also *Goble v. Frohman* (Fla. 2005) 901 So.2d 830, 833 (conc. opn. of Bell, J.) [collateral source rule has no application where plaintiff "has not paid, nor is he obligated to pay, the prediscount amount of his medical bills"].)  "Certainly, the collateral source rule should not extend so far as to permit recovery for sums neither the plaintiff nor any collateral source will ever be obligated to pay." (Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits* (1998) 21 Am. J. Trial Advoc. 453, 489.)

The negotiated rate differential lies outside the operation of the collateral source rule also because it is not primarily a benefit to the plaintiff and, to the extent it does benefit the plaintiff, it is not provided as "compensation for [the plaintiff's] injuries." (*Helfend*, *supra*, 2 Cal.3d at p. 6.)  Insurers and medical providers negotiate rates in pursuit of their own business interests, and the benefits of the bargains made accrue directly to the negotiating parties.  The primary

24

benefit of discounted rates for medical care goes to the payer of those rates—that is, in largest part, to the insurer.

Nor does the insurer negotiate or the medical provider grant a discounted payment rate *as compensation for the plaintiff's injuries*. As one amicus curiae observes, sellers in almost any industry may, for a variety of reasons, discount their prices for particular buyers, "[b]ut a discounted price is not a payment. . . . [¶] . . . [¶] Nor has the value of damages the plaintiff *avoided* ever been the measure of tort recovery." And even when the overall savings a health insurance organization negotiates for itself can be said to benefit an insured indirectly—through lower premiums or copayments, for example—it would be rare that these indirect benefits would coincidentally equal the negotiated rate differential for the medical services rendered the plaintiff.

Finally, while the providers presumably did obtain some commercial advantages by virtue of their agreements with PacifiCare, plaintiff's insurer, the *global* value of those advantages cannot be equated to the amount of the negotiated rate differential for plaintiff's *individual* care. As we have seen, a medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value. Within a single hospital's chargemaster, for example, "[m]ark-ups tend to vary by service line, with high cost items receiving a lower mark-up than low cost items." (Dobson et al., A Study of Hospital Charge Setting Practices, *supra*, at p. v.) The price schedules for PacifiCare members, meanwhile, were negotiated for the entire PPO membership, not individually for plaintiff, and covered a range of medical services Scripps and CORE provided, not only those rendered to plaintiff. For a given medical service to a given plaintiff, therefore, the amount of the negotiated rate differential may be higher or lower than the average discount over the range of services offered. The negotiated rate differential in a particular case thus does

25

not necessarily reflect the commercial advantages the provider obtained in exchange for accepting a discounted payment *in that case*.

We conclude the negotiated rate differential is not a collateral payment or benefit subject to the collateral source rule. We emphasize, however, that the rule applies with full force here and in similar cases. Plaintiff here recovers the amounts paid on her behalf by her health insurer as well as her own out-of-pocket expenses. No "credit[] against the tortfeasor's liability" (Rest.2d Torts, § 920A, subd. (2)) and no deduction from the "damages which the plaintiff would otherwise collect from the tortfeasor" (*Helfend*, *supra*, 2 Cal.3d at p. 6) is allowed for the amount paid through insurance. Plaintiff thus receives the benefits of the health insurance for which she paid premiums: her medical expenses have been paid per the policy, and those payments are not deducted from her tort recovery.

Plaintiff's insurance premiums contractually guaranteed payment of her medical expenses at rates negotiated by the insurer with the providers; they did not guarantee payment of much higher rates the insurer never agreed to pay. Indeed, had her insurer not negotiated discounts from medical providers, plaintiff's premiums presumably would have been higher, not lower. In that sense, plaintiff clearly did not pay premiums for the negotiated rate differential. Recovery of the amount the medical provider agreed to accept from the insurer in full payment of her care, but no more, thus ensures plaintiff "receive[s] the benefits of [her] thrift" and the tortfeasor does not "garner the benefits of his victim's providence." (*Helfend*, *supra*, 2 Cal.3d at p. 10.)

In holding plaintiff may not recover as past medical damages the amount of a negotiated rate differential, then, we do not alter the collateral source rule as articulated in *Helfend* and the Restatement. Rather, we conclude that because the plaintiff does not incur liability in the amount of the negotiated rate differential, which also is not paid to or on behalf of the plaintiff to cover the expenses of the

26

plaintiff's injuries, it simply does not come within the rule. "[A] rule limiting the measure of recovery to paid charges (where the provider is prohibited from balance billing the patient) . . . provides certainty without violating the principles protected by the collateral source rule. Even with a limit of recovery to the net loss there is no lessening of the deterrent force of tort law, the defendant does not gain the benefit of the plaintiff's bargain, and the plaintiff receives full compensation for the amount of the expense he was obligated to pay." (Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits*, *supra*, 21 Am. J. Trial Advoc., at p. 489.)

There is, to be sure, an element of fortuity to the compensatory damages the defendant pays under the rule we articulate here. A tortfeasor who injures a member of a managed care organization may pay less in compensation for medical expenses than one who inflicts the same injury on an uninsured person treated at a hospital (assuming the hospital does not offer the person a discount from its chargemaster prices). But, as defendant notes, "[f]ortuity is a fact in life and litigation." To use an example provided by amicus curiae League of California Cities, when a driver negligently injures a pedestrian the amount of lost income the injured plaintiff can recover depends on his or her employment and income potential, a matter of complete fortuity to the negligent driver. In that situation as in this, "[i]dentical injuries may have different economic effects on different victims." We should not order one defendant to pay damages for an economic loss the plaintiff has not suffered (Civ. Code, §§ 3281, 3282) merely because a

27

different defendant may have to compensate a different plaintiff who *has* suffered such a loss.**10**

We hold, therefore, that an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial. In so holding, we in no way abrogate or modify the collateral source rule as it has been recognized in California; we merely conclude the negotiated rate differential—the discount medical providers offer the insurer—is not a benefit provided to the plaintiff in compensation for his or her injuries and therefore does not come within the rule. For this reason, plaintiff's argument that any reform of the collateral source rule should come from the Legislature rather than this court misses the mark. Government Code section 985 and Civil Code section 3333.1, which limit or eliminate the collateral source rule for cases involving, respectively, public entity defendants and negligence of a health care provider, simply do not speak to the issue presented here. Our holding

---

**10** Plaintiff cites several decisions from other states in which courts have declined to follow *Hanif*, expressed the view that a negotiated rate differential should be recoverable as a collateral source payment, or both. (See, e.g., *Lopez v. Safeway Stores, Inc.* (Ariz.Ct.App. 2006) 129 P.3d 487, 491-497; *Bynum v. Magno* (Hawaii 2004) 101 P.3d 1149, 1155-1162; *Wills v. Foster* (Ill. 2008) 892 N.E.2d 1018, 1029-1031; *White v. Jubitz Corp.*, *supra*, 219 P.3d at pp. 576-583.) By and large, however, these decisions rest on reasoning we have considered and rejected above, or on statutory provisions without California parallel. And while ours may presently be the minority view, several other courts have reached the same conclusion. (See, e.g., *Boutte v. Kelly* (La.Ct.App. 2003) 863 So.2d 530, 552-553; *Kastick v. U-Haul Co. of Western Michigan* (N.Y.App.Div. 2002) 740 N.Y.S.2d 167, 169; *Moorhead v. Crozer Chester Medical Center*, *supra*, 765 A.2d at pp. 789-791; see also *Goble v. Frohman*, *supra*, 901 So.2d at pp. 833-835 (conc. opn. of Bell, J.); *Robinson v. Bates* (Ohio 2006) 857 N.E.2d 1195, 1200 [a negotiated rate differential does not come within the collateral source rule].)

neither contradicts or undermines these statutes nor alters their operation. Trial courts continue to have authority to reduce a plaintiff's recovery against a public entity under Government Code section 985; in an action arising from the professional negligence of a health care provider, evidence of indemnity payments made to the plaintiff, and premiums paid by the plaintiff, continues to be admissible under the circumstances set out in Civil Code section 3333.1.

It follows from our holding that when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses and, assuming it satisfies other rules of evidence, is admissible at trial. Evidence that such payments were made in whole or in part by an insurer remains, however, generally inadmissible under the evidentiary aspect of the collateral source rule. (*Hrnjak v. Graymar, Inc.*, *supra*, 4 Cal.3d at p. 732.) Where the provider has, by prior agreement, accepted less than a billed amount as full payment, evidence of the full billed amount is not itself relevant on the issue of past medical expenses. We express no opinion as to its relevance or admissibility on other issues, such as noneconomic damages or future medical expenses. (The issue is not presented here because defendant, in this court, conceded it was proper for the jury to hear evidence of plaintiff's full medical bills.)

Where a trial jury has heard evidence of the amount accepted as full payment by the medical provider but has awarded a greater sum as damages for past medical expenses, the defendant may move for a new trial on grounds of excessive damages. (Code Civ. Proc., § 657, subd. 5.) A nonstatutory "*Hanif* motion" is unnecessary. The trial court, if it grants the new trial motion, may permit the plaintiff to choose between accepting reduced damages or undertaking a new trial. (*Id.*, § 662.5, subd. (b).)

29

In the case at bench, the trial court correctly ruled plaintiff could recover as damages for her past medical expenses no more than her medical providers had accepted as payment in full from plaintiff and PacifiCare, her insurer. The Court of Appeal, believing incorrectly that this ruling violated the collateral source rule, reversed the trial court's ruling on the merits and thus had no occasion to resolve plaintiff's claims of procedural and evidentiary error. As these issues were not resolved in the Court of Appeal, they were not included in defendant's petition for review, and we do not address them. (Cal. Rules of Court, rule 8.516(b)(1).) On remand the Court of Appeal may, as appropriate, consider any remaining issues regarding the procedures and evidence on which the trial court ordered the damages reduced.

## DISPOSITION

The judgment of the Court of Appeal is reversed. The matter is remanded to that court for further proceedings consistent with our opinion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**

30

**DISSENTING OPINION BY KLEIN, J.**

I respectfully dissent. I agree Rebecca Howell (Howell), who was insured by PacifiCare under a preferred provider organization (PPO) health insurance policy, is not entitled to recover the gross amount of her potentially inflated medical bills. However, I disagree with the majority insofar as it concludes Howell's recovery of medical damages must be capped at the discounted amount her medical providers agreed to accept as payment in full from her insurer. Rather, Howell should be entitled to recover the *reasonable value* or market value of such services, as determined by expert testimony at trial, just as would be the case if the injured person had not purchased insurance or if the medical services had been donated.

The majority, while it states "we do not alter the collateral source rule as articulated in *Helfend* [*v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1] and the Restatement" (maj. opn., *ante*, at p. 26), creates a significant exception to this state's long-standing collateral source rule. The majority draws a bright line and limits Howell's recovery of medical damages to "no more than the medical providers accepted in full payment for their services." (*Id.* at p. 23.) Thus, Howell is left in a worse position than an uninsured individual or one who was a donee of medical services, persons who are entitled to recover the full reasonable value of their medical care. (*Arambula v. Wells* (1999) 72 Cal.App.4th 1006, 1012 (*Arambula*) [tortfeasor cannot mitigate damages because of a third party's charitable gift]). Neither law nor policy supports such an anomalous outcome.

1

The majority holds the "negotiated rate differential" (the *difference* between the original billed amount of $189,978.63 and the lesser amount accepted by the providers as payment in full) lies outside the operation of the collateral source rule because the plaintiff did not suffer any economic loss in the amount of the negotiated rate differential and therefore said sum is not recoverable by plaintiff.

The majority fails to recognize the difference between the *reasonable value* of Howell's care (hypothetically, $75,000) and the *lesser sum* Howell's preferred providers agreed to accept as *payment in full* ($59, 691.73), did constitute a payment by others, namely, the medical providers, toward the cost of treating Howell. Howell's medical providers, as participants in PacifiCare's PPO network, *wrote off* a portion of her bills, pursuant to their agreements with PacifiCare. By acquiring the PPO policy, Howell purchased not only indemnity coverage but also access to the negotiated discounts between her health insurer and her medical providers. Therefore, any difference between the *reasonable value* of Howell's treatment, and the *lesser amount* the providers agreed to accept as *payment in full*, was a benefit Howell is entitled to retain under the collateral source rule. There is little justification for allowing a defendant tortfeasor to avoid liability for the reasonable value of a plaintiff's medical expenses, where such value exceeds the negotiated payment.

The task before this court is twofold. In the era of managed care, the court is grappling with the problem of injured plaintiffs recovering compensatory damages based on allegedly inflated medical bills, while continuing to adhere to the collateral source rule and the policies underlying the rule.

The Court of Appeal held Howell is entitled to recover the *gross undiscounted amount* of her medical bills (i.e., $189,978.63), including the full amount of the "negotiated rate differential" (i.e., the difference between the original billed amount and the lesser amount accepted by the providers as payment in full).

In contrast, the majority limits Howell's recovery as economic damages for past medical expenses to "no more than the medical providers accepted in full payment for their services" (maj. opn., *ante*, at p. 23), amounting to $59,691.73.

There is an intermediate position between these two ends of the spectrum, one more consistent with both the collateral source rule and with the deterrent function of tort law: For purposes of determining the application of the collateral source rule, a plaintiff who has purchased private health insurance, just like a plaintiff who is a donee or is uninsured, should be entitled to recover from the defendant tortfeasor economic damages for past medical expenses an amount not to exceed the *reasonable value* of medical expenses which the plaintiff incurred for tortiously caused injuries. Howell should be entitled to recover the *reasonable value* of her medical care, *no more and no less*. That the plaintiff may have purchased a negotiated rate benefit is not, for purposes of the collateral source rule, relevant.

By limiting the plaintiff's recovery to the *reasonable value* of the treatment (an amount which the plaintiff is required to prove at trial), I would eliminate the potential mischief created by the Court of Appeal's opinion, which enables a plaintiff to recover damages for medical expenses based on potentially inflated medical bills, while still preserving the full protection of the collateral source rule for all injured plaintiffs, whether or not covered by private insurance.

Under the reasonable value approach, in the event the reasonable value of a plaintiff's treatment *exceeds* the amount the medical providers have agreed to accept as payment in full from plaintiff's insurer, such difference would be allocated to the plaintiff, rather than to the defendant tortfeasor. This approach preserves the long-standing collateral source rule, and at the same time, prevents a plaintiff from recovering excessive damages based on potentially inflated medical bills.

1. *Policy considerations underlying the collateral source rule.*

a. *The collateral source rule represents the sound policy judgment of encouraging citizens to purchase insurance and denying the tortfeasor the benefits of the victim's providence.*

It has long been settled in California that " '[d]amages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance effected by him, and to the procurement of which the wrongdoer did not contribute. . . .' " (*Loggie v. Interstate Transit Co.* (1930) 108 Cal.App. 165, 169; accord *Helfend v. Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d at p. 6 (*Helfend*); *Peri v. L. A. Junction Ry.* (1943) 22 Cal.2d 111, 131.)

In *Helfend*, this court engaged in an extensive review of the policy arguments for and against the collateral source rule and reaffirmed its adherence to the rule as it has developed in California. In the context of insurance payments for medical treatment, where the rule is most frequently applied, the court stated the collateral source rule "*embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence.* [¶] The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Helfend, supra,* 2 Cal.3d at pp. 9-10, italics added.)

4

b. *Deterrence of tortious conduct; the collateral source rule ensures the tortfeasor pays the full cost of its negligence or wrongdoing.*

When an injured plaintiff has received collateral compensation from insurance, a gift, or other sources (*such as the expense borne by the preferred providers, which wrote off a portion of their bills pursuant to the PPO contract*), allowing a deduction for damages in that amount would result in a windfall for the tortfeasor and underpayment for the injury. (*Helfend, supra*, 2 Cal.3d at p. 10; *Arambula, supra*, 72 Cal.App.4th at pp. 1013-1014.) Because the tortfeasor would not be paying the full cost of its negligence or wrongdoing, a deduction for collateral compensation would distort the deterrent function of tort law. (See Katz, *Too Much of a Good Thing: When Charitable Gifts Augment Victim Compensation* (2003) 53 DePaul L.Rev. 547, 564 [if a charitable gift to the plaintiff reduces tort recovery, the defendant "pays less than the full social costs of his conduct and is underdeterred"].)

2. *The difference between the reasonable value of the medical services and the lesser sum the medical provider agreed to accept as payment in full constitutes a "payment by others" on behalf of the injured person and therefore is a benefit within the meaning of the collateral source rule.*

The majority acknowledges the negotiated rate differential is not a gift by the provider to the injured plaintiff, but it regards the negotiated rate differential as merely a price discount. However, because the issue at bench is the application of the collateral source rule, involving (1) an injured party, (2) the injured party's PPO health insurance policy, and (3) a negligent tortfeasor, treating the negotiated rate differential as nothing more than a discount is, in my view, inappropriate.

The majority properly recognizes: "Medical providers that agree to accept discounted payments by managed care organizations or other health insurers as full payment for a patient's care *do so not as a gift to the patient or insurer, but for commercial reasons and as a result of negotiations*. As plaintiff herself explains, hospitals and medical groups obtain commercial benefits from their agreements

5

with health insurance organizations; the agreements guarantee the providers prompt payment of the agreed rates and often have financial incentives for plan members to choose the providers' services." (Maj. opn., *ante,* at p. 15, italics added.)

However, the fact that Howell's medical providers, as participants in a PPO network, agreed to accept discounted payments motivated by their economic self-interest, rather than with a donative intent, should not make a difference in the analysis of the issues presented herein. The majority's analysis rests upon a distinction between commercial motive and donative intent, a distinction the majority has failed to explain. Had Howell been uninsured, or had Howell's providers donated their services, Howell would be entitled to recover the *reasonable cost* of her medical care. It is anomalous to limit Howell's recovery of medical damages to the deeply discounted amount her providers accepted as payment in full, merely because Howell was insured under a PPO policy, rather than being uninsured or a donee. Howell should not be penalized, nor should the negligent tortfeasor be rewarded, based on the manner in which her PPO policy is structured.

Clearly, medical providers in a PPO network benefit from their status as preferred providers in significant ways: the preferred providers obtain access to an expanded client base; the preferred providers have greater certainty of being paid for their services; and the preferred providers can expect relatively prompt reimbursement. In return for these commercial benefits, the preferred providers agree with the insurer to accept reduced fees for their services. The insurer likewise derives a commercial benefit from the PPO system through greater cost control and reduced costs for patient care. At the same time, the PPO system has advantages for the consumer who enjoys reduced fees when obtaining care through a preferred provider.

This recognition of the existence of a tripartite negotiated relationship among the insured, the insurer, and the medical providers, informs the proper

characterization of the "negotiated rate differential." It is undisputed the negotiated rate differential was *not a gratuitous payment* by the providers. Nor should the negotiated rate differential be deemed a *mere price discount* by a vendor. Rather, the negotiated rate differential was, in effect, a "payment by a third party," namely, the medical providers, which wrote off a portion of Howell's bills. It is undisputed that "[w]hen, as here, the costs of medical treatment *are paid in whole or in part by a third party* unconnected to the defendant, the collateral source rule is implicated." (Maj. opn., *ante*, at p. 5, italics added.) Accordingly, to the extent the *reasonable* value of Howell's care exceeded the amount accepted by her providers in full payment, that sum should be considered a benefit covered by the collateral source rule.

Although the majority recognizes the collateral source rule is implicated whenever the costs of medical treatment are paid in whole or in part by a nontortfeasor third party, it takes the position the negotiated rate differential, i.e., the discount medical providers offer the insurer, was "*never paid by or on behalf of the injured person*" (maj. opn., *ante*, at p. 1, italics added), and therefore does not come within the collateral source rule.

Said conclusion overlooks the fact the preferred providers absorbed a portion of the reasonable cost of treating Howell by *writing off* a portion of her bills. *The fee reduction, a benefit to which Howell was entitled under the PPO policy, was purchased with costly health insurance premiums and was an essential part of the bargain between Howell and PacifiCare.* Thus, it is entirely appropriate to recognize the difference between the *reasonable value* of the medical services and the *lesser amount* the providers agreed to accept in full payment for their services, as a payment made by others, namely, the providers, on Howell's behalf. A consistent application of the collateral source rule, as it prevails in the United States, entitles Howell to retain that benefit. (See pt. 5, *post*.)

7

3. *Limiting plaintiff's recovery to the reasonable cost of care prevents a windfall recovery by the victim based on potentially inflated medical bills.*

The problem in the instant case arises due to the practice of inflating medical charges and then deeply discounting them, which has become the norm in this era of managed care.

"Before managed care, hospitals billed insured and uninsured patients similarly. In 1960, '[t]here were no discounts; everyone paid the same rates' – usually cost plus ten percent. But as some insurers demanded deep discounting, hospitals vigorously shifted costs to patients with less clout." (Hall & Schneider, *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace* (2008) 106 Mich. L.Rev. 643, 663, fns. omitted.) As a consequence, "only uninsured, self-paying U.S. patients have been billed the full charges listed in hospitals' inflated chargemasters." (Reinhardt, *The Pricing of U.S. Hospital Services: Chaos Behind a Veil of Secrecy* (2006) 25 Health Affairs 57, 62; see Health & Saf. Code, § 1339.51, subd. (b)(1) [chargemaster, or hospital charge description master is "a uniform schedule of charges represented by the hospital as its gross billed charge for a given service or item, regardless of payer type"].)

Therefore, to reconcile the collateral source rule with the problem posed by potentially inflated medical bills, a uniform rule should apply. Irrespective of whether a plaintiff has private health insurance, is a donee or is uninsured, the plaintiff should be entitled to recover as economic damages for past medical expenses *the reasonable value* of the medical expenses the plaintiff incurred for tortiously caused injuries.

With this approach, in the event the reasonable value of the plaintiff's treatment *exceeds* the amount the medical providers agreed to accept as payment in full from plaintiff's insurer, that difference is allocated to the plaintiff, rather than to the tortfeasor. This fully preserves the collateral source rule, and at the same time prevents a plaintiff from recovering excessive damages pursuant to potentially inflated medical bills.

8

4. *Collateral source rule does not yield a double recovery.*

*Helfend* observed that insurance policies increasingly provide for either subrogation or *refund of benefits* upon recovery from the tortfeasor, thus transferring the risk from the victim's insurer to the tortfeasor by way of the victim's tort recovery. (*Helfend, supra,* 2 Cal.3d at pp. 10-11.) *Helfend* explained that viewed from this perspective, the collateral source rule does not permit the plaintiff a double recovery, as critics of the rule have charged. (*Ibid.*) Further, "[t]he collateral source rule partially serves to compensate for the attorney's share and does not actually render 'double recovery' for the plaintiff." (*Id.* at p. 12.)

Consequently, it should be recognized that where an insured plaintiff prevails and obtains an award of economic damages for past medical expenses from a third party, the insured generally is contractually required to reimburse the health insurer to the extent the insured recovers on her judgment against the tortfeasor. In addition to having to reimburse the health insurer, the plaintiff will have incurred attorney fees to prosecute the claim for economic damages.

Thus, because the plaintiff's award of economic damages for past medical expenses is likely to be largely transferred from the defendant (or from the defendant's insurer) to the plaintiff's insurer and to the plaintiff's attorney, the award is not likely to yield a windfall to the plaintiff.

In addition, it should be recognized the collateral source rule serves to protect the "person who has invested years of insurance premiums to assure [her] medical care." (*Helfend, supra,* 2 Cal.3d at pp. 9-10.) However, the award of compensatory damages does not expressly include reimbursement to the plaintiff for those premiums. It is only through the application of the collateral source rule that the plaintiff is rewarded for maintaining his or her own health insurance for personal injuries.

9

For all these reasons, any perceived windfall to the plaintiff as a consequence of the collateral source rule represents a relatively minor portion of plaintiff's overall recovery of economic damages. Further, as between the injured person and the tortfeasor, the equities dictate such benefit should be allocated to the injured party, not to the negligent tortfeasor. Indeed, it is difficult to understand just what policy considerations justify denying the thrifty or prudent plaintiff who has purchased private health insurance the full benefit of his or her own foresight, and instead, transferring that benefit to the tortfeasor.

5. *This court should follow the majority rule in the United States, which is consistent with the Restatement Second of Torts.*

The majority, limiting plaintiff's recovery of medical damages to the amount her medical providers accepted as payment in full from plaintiff's insurer, has failed to explain why California should align itself with the minority view in the United States.

By way of background, courts across the country have considered the issue of whether the collateral source rule allows a plaintiff to recover insurance write-offs. Three general approaches have emerged: (1) *the reasonable value of services*; (2) the benefit of the bargain; and (3) the actual amounts paid. (See, e.g. *Martinez v. Milburn Enterprises, Inc*. (2010) 290 Kan. 572, 591-592.)

" '[T]he vast majority of courts to consider the issue' follow the common-law rule articulated in section 924 of the *Restatement* and permit plaintiffs to seek the reasonable value of their expenses without limitation to the amount that they pay or that third parties pay on their behalf. See *Wills v. Foster*, 229 Ill.2d 393, 414, 323 Ill.Dec. 26, 892 N.E.2d 1018, 1031 (2008) (so stating)." (*White v. Jubitz Corp*. (Or. 2009) 347 Or. 212, 237.)

The Restatement Second of Torts, section 924, is entitled "Harm to the Person." It provides, in part, that "[o]ne whose interests of personality have been tortiously invaded is entitled to recover damages for past or prospective [¶] . . . [¶] *(c) reasonable medical* and other expenses[.]" (*Ibid*., italics added.) Comment f

10

to that section, entitled "Expenses," provides that an "injured person is entitled to damages for all expenses and for the *value of services reasonably made necessary by the harm.*" (Rest. 2d Torts, § 924, com. f, p. 526, italics added.) Comment f then instructs that "[t]he *value of medical services made necessary* by the tort can ordinarily be recovered although they have created no liability or expense to the injured person, as when a physician donates his services." (*Id.*, at p. 527, italics added, referring to Rest. 2d Torts, § 920A.) Thus, "the *Restatement* permits a plaintiff to recover from a tortfeasor the *reasonable value* of the medical treatment that he or she receives whether plaintiff is liable to pay or pays the medical providers' charges for that treatment, the providers waive those charges, or a third party pays or otherwise satisfies those charges." (*White v. Jubitz Corp.*, *supra*, 347 Or. at p. 236, italics added.) Under the Restatement rule, "plaintiffs who incur the same injuries as a result of a defendant's tort[i]ous actions may claim and recover the same damages." (*Ibid.*; see also *Martinez v. Milburn Enterprises, Inc., supra,* 290 Kan. at p. 602 [reasonable value of medical services is the fairest approach; " 'to do otherwise would create separate categories of plaintiffs based on the method used to finance medical expenses' " (italics omitted)].)

The majority's rationale for eschewing the majority rule is that those out-of-state decisions "rest on reasoning we have considered and rejected above, *or on statutory provisions without California parallel.*" (Maj. opn., *ante*, at p. 28, fn. 10, italics added.) However, insofar as the majority does not discuss how the statutes of our sister states differ from our damages statutes (see, e.g., Civ. Code, § 3281, 3282, 3333), it is unpersuasive.

6. *Statutory provisions in the Civil Code do not bar plaintiff's recovery of the difference between the reasonable value of the medical services and the lesser amount the providers agreed to accept as full payment.*

The majority takes the position that unlike the law of other states, California's damages statutes bar Howell from recovering as damages for medical expenses anything in excess of the amount her medical providers agreed to accept

11

as payment in full. That conclusion is unwarranted. Our damages statutes do not preclude this court from following the majority rule and authorizing compensation to Howell for the reasonable value of her medical treatment.

The pertinent statutes are as follows: Every person "who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." (Civ. Code, § 3281.) The measure of damages generally recoverable in tort is "the amount which will compensate for all the detriment proximately caused" by the tort. (*Id.*, § 3333.) Detriment is "a loss or harm suffered in person or property." (*Id.*, § 3282.)

The maxims embodied in these statutory provisions do not dictate the conclusions reached by the majority. It is undisputed that "[w]hen, as here, the costs of medical treatment *are paid in whole or in part by a third party unconnected to the defendant,* the collateral source rule is implicated." (Maj. opn., *ante*, at p. 5, italics added.)

As this dissent has sought to explain, in the instant case the costs of Howell's medical treatment were partially borne by third parties, namely, Howell's preferred medical providers, which wrote off a significant portion of her bills pursuant to a tripartite contract for which valuable consideration was paid. Therefore, any difference between the reasonable value of Howell's care and the lesser amount the providers accepted as payment in full constitutes *detriment,* which is recoverable by Howell from the tortfeasor.

7. *Determining the reasonable value of plaintiff's medical care; procedure in future cases.*

The majority precludes any inquiry into the reasonable value of the patient's care and limits the plaintiff's recovery of medical damages to the amount her preferred providers accepted as payment in full. The majority's bright-line approach rests on the assumption "the negotiated prices providers accept from insurers" is equivalent to the reasonable value, or "exchange value of medical

12

services the injured plaintiff has been required to obtain." (Maj. opn., *ante*, at p. 21.)

However, the reasonable value of the patient's care is a question for the trier of fact. It may be that the sum the providers accepted in full payment is equivalent to the reasonable value of the care, or it may be that the reasonable value of the care is a higher figure. Preferred providers discount their fees to PPO members because the providers "obtain commercial benefits from their agreements with health insurance organizations" (maj. opn., *ante*, at p. 15), such as an expanded clientele. This court should not speculate that the amount a preferred provider accepts as payment in full from the insurer is equivalent to the reasonable value of the services rendered.

The inquiry at trial should be the same, irrespective of whether the injured plaintiff was covered by a PPO health insurance policy, was a donee, or was uninsured. The plaintiff's burden is to prove the *reasonable value* of the medical care needed to treat his or her tortiously caused injuries.

"Due to the realities of today's insurance and reimbursement system, in any given case, that determination is not necessarily the amount of the original bill or the amount paid. Instead, the reasonable value of medical services is a matter for the jury to determine from all relevant evidence. Both the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care. [¶] The jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between." (*Robinson v. Bates* (Ohio 2006) 112 Ohio St.3d 17, 23 [857 N.E.2d 1195, 1200].) California jurors are as capable as jurors in Ohio or elsewhere of making that determination.

A plaintiff may attempt to rely on the undiscounted medical bills to establish economic damages, but if such billing is inflated, it would be exposed on cross-examination and through defense expert testimony. For example, if a chest

13

X-ray was billed at $1,500 but the evidence shows the provider has rarely, if ever, obtained that sum in payment, or if the evidence shows the billed amount significantly exceeds the charges by other medical providers for such treatment, the trier of fact would take such evidence into consideration in assessing the reasonable value of the treatment. A jury, with the help of expert opinion testimony, is capable of weighing the evidence and determining the reasonable value of the medical services provided to the plaintiff.

Finally, in the event the verdict as to past medical expenses is excessive, the defendant can move for a new trial on that basis. (Code Civ. Proc., § 657, subd. 5.)

8. *Any modification to the collateral source rule should be left to the Legislature.*

There is nothing unique about PPO insurance coverage that requires this court to carve out a special rule governing the negotiated rate differential in this type of health insurance. An injured person with PPO coverage, like uninsured plaintiffs or donees, should be able to recover the reasonable value of care required to treat the tortiously caused injuries.

Any change to the collateral source rule should be left to the Legislature. (*Olsen v. Reid* (2008) 164 Cal.App.4th 200, 213-214 (conc. opn. of Moore, J.).) The Legislature twice has abrogated or modified the collateral source rule, in the Medical Injury Compensation Reform Act (Civ. Code, § 3333.1, subd. (a) [health care providers]) and in Government Code section 985 (public entity defendants), and can do so again if it sees fit.

"It may well be that the collateral-source rule itself is out of sync with today's economic realities of managed care and insurance reimbursement for medical expenses. However, whether plaintiffs should be allowed to seek recovery for medical expenses . . . only for the amount negotiated and paid by insurance is for the [Legislature] to determine." (*Robinson v. Bates, supra*, 857 N.E.2d at p. 1201.)

14

9. *Proposed disposition.*

The judgment of the Court of Appeal should be reversed with directions to remand the matter to the trial court for a limited new trial to determine, and award, the reasonable value of the medical services which Howell received for her tortiously caused injuries.

**KLEIN, J.**[*]

---

[*] Presiding Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Howell v. Hamilton Meats & Provisions, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 179 Cal.App.4th 686
**Rehearing Granted**

_____

**Opinion No.** S179115
**Date Filed:** August 18, 2011

_____

**Court:** Superior
**County:** San Diego
**Judge:** Adrienne A. Orfield

_____

**Counsel:**

Law Office of Gary L. Simms, Gary L. Sims; LaFave & Rice, John J. Rice; Basile Law Firm, J. Jude Basile; Law Offices of J. Michael Vallee and J. Michael Vallee for Plaintiff and Appellant.

Barbara A. Jones; Michael Schuster, Kelly Bagby and Bruce Vignery for AARP as Amicus Curiae on behalf of Plaintiff and Appellant.

Hinton, Alfert & Sumner, Scott H. Z. Sumner, Jeremy N. Lateiner; Liberson & Wolford and Joel K. Liberson for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Tyson & Mendes, Robert F. Tyson, Mark T. Petersen and Kristi Deans for Defendant and Respondent.

McCormick, Barstow, Sheppard, Wayte & Carruth, Dean Petrulakis, John M. Dunn and Jeffrey R Olson for CSAC Excess Insurance Authority and Central Region School Insurance Group as Amici Curiae on behalf of Defendant and Respondent.

Hayes, Scott, Bonino, Ellingson & McLay and Mark G. Bonino for Association of Defense Counsel of Northern California and Nevada as Amicus Curiae on behalf of Defendant and Respondent.

Sedgwick, Detert, Moran & Arnold, Christina J. Imre and Kirk Jenkins for Allstate Insurance Company as Amicus Curiae on behalf of Defendant and Respondent.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Respondent.

Greines, Martin, Stein & Richland and Robert A. Olson for Association of Southern California Defense Counsel and DRI-The Voice of the Defense Bar as Amici Curiae on behalf of Defendant and Respondent.

**Page 2 – S179115 – counsel continued:**

Horvitz & Levy, David S. Ettinger and H. Thomas Watson for American Insurance Association, Association of California Insurance Companies, Personal Insurance Federation of California, California State Automobile Association Inter-Insurance Bureau, Chartis, Inc., Farmers Insurance Exchange, Infinity Insurance Company, Interinsurance Exchange of the Automobile Club, Mercury Insurance Group, State Farm General Insurance Company and State Farm Mutual Automobile Insurance Company as Amici Curiae on behalf of Defendant and Respondent.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendant and Respondent.

Newdorf Legal, David B. Newdorf and Vicki F. Van Fleet for The League of California Cities as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary L. Sims
Law Office of Gary L. Simms
2050 Lyndell Terrace, Suite 240
Davis, CA  95616-6206
(530) 564-1640

Robert F. Tyson
Tyson & Mendes
5661 La Jolla Blvd.
La Jolla, CA  92037
(858) 459-4400

Robert A. Olson
Greines, Martin, Stein & Richland
5900 Wilshire Boulevard, 12th Floor
Los Angeles, CA  90036
(310) 859-7811