Filed 7/16/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANTHONY S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. ANTHONY S., Defendant and Appellant. | A140118 (Contra Costa County Super. Ct. No. J0801252) |

Anthony S. admitted an assault with a firearm, in which he and a co-defendant seriously wounded Melvin Houston, resulting in a hospital bill of over $400,000. The hospital has not attempted to collect from Houston, having determined that he was indigent and the debt was uncollectable. At a hearing to set restitution, a hospital representative testified that after a debt is written off as uncollectable, the hospital generally makes no further attempt to recover it. Nevertheless, the juvenile court ordered Anthony to pay $81,509.38 in restitution to Houston. On appeal, Anthony argues that the restitution order was contrary to Welfare and Institutions Code[1] section 730.6 because there was insufficient evidence of economic loss to Houston. We disagree and affirm the restitution order.

---

[1] Unless otherwise indicated, statutory citations are to the Welfare and Institutions Code.

1

## BACKGROUND

Because the matter at issue on appeal is restitution, Anthony's juvenile history and the facts of the underlying crime are not particularly relevant. It suffices to say that on April 11, 2011, Anthony, then 15 years old, admitted an assault with a firearm (Pen. Code, § 245, subd. (a)(2)), as well as great bodily injury and criminal street gang enhancements, that had been alleged in a section 602, subdivision (a), petition. According to the probation report, Anthony and a co-defendant had fired shots at Houston. Houston sustained injuries to his buttocks, rectum, pelvic artery, vein, and five areas of his bowel. Houston required two surgeries to repair the damage and extract the bullet.

On May 9, 2011, the court committed Anthony to the custody of the Department of Juvenile Justice (DJJ), with a maximum term of confinement of 10 years.[2] The matter of victim restitution remained open pending Houston's full recovery.

On August 8, 2013, the probation department informed the court that Houston's balance at John Muir Hospital (John Muir) was $412,546.89. Houston had not qualified for Medi-Cal or received assistance from other health providers and had been denied compensation from the victim compensation program. Because Anthony had paid $1,000 to the victim restitution fund, the probation department recommended that restitution be set at $411,546.89, Anthony to be jointly and severally liable along with the co-defendant.

The billing statement from John Muir, addressed to Houston, was entered into evidence at a hearing on August 8, 2013. However, the matter was put over so that Anthony's counsel could further investigate the amount of restitution sought.

At a hearing on September 12, 2013, Anthony's counsel called Larry Blythe, John Muir's manager of patient billing, as a witness. Blythe testified that nothing had been paid on Houston's bill and that the hospital had "written off the balance based [on] the

---

[2] Anthony was granted discharge from DJJ on July 2, 2013.

2

patient's indigent status." He also testified that there would be no effort to collect from Houston on the debt.

On cross-examination, Blythe explained that when an outstanding bill was written off, "[i]t is considered uncollectible debt and we claim it as charitable dollars." Blythe explained, "It's a debt that we would not pursue or expect to recover funds from." The court asked Blythe: "[A]ssuming the patient were to hit the lottery or get some kind of restitution recovery from a third party, your actions in writing off the debt [are] not final; is that right?" Blythe replied, "Sir, we would not go—there is no attempt to retro-recover. But if the ability to recover the debt presented itself, settlement options or ability or transparency on someone hitting the lottery, then we would accept that recovery."

The court then asked, "Does John Muir actively monitor which of their patients have potential restitution recoveries from related accident or criminal proceedings?" Blythe replied, "To the best of our ability, prior to writeoff, we do. Once the account balance is written off, we generally do not go back and look for other methods of reimbursement." Blythe stated that at the time Houston's debt was written off, the hospital was not aware of a criminal proceeding in which Anthony and another minor would be asked to pay the amount due to John Muir. Blythe was not asked whether, now that he had become aware of the possibility that Houston would obtain a criminal restitution judgment, John Muir would do anything more to collect on his debt to the hospital. The record shows only that the debt has been written off and that no efforts would be made to collect it.

Anthony's counsel argued that because the account had been written off, no restitution should be ordered in connection with the hospital bill. The court replied: "[I]sn't it the normal practice of the hospitals to write off these amounts? They almost always write off these amounts. What does the fact, from a restitution perspective and from the fact that the minor can't take advantage or shouldn't be allowed to take advantage of generally accepted accounting principles[?] I'm not following your argument that he is to get the benefit of the status of Mr. Houston's indigent

3

circumstance. In other words, your argument is that because he happened to victimize someone who was particularly impoverished he should benefit. If he happened to strike somebody else who was richer and would not be subject to this bookkeeping entry, then he'd have to pay the full amount of the restitution. I'm not following the principle that you're asking me to enforce."

Anthony's counsel pointed out that the hospital was not a direct victim and that Houston had not paid any money, so nothing was owed to Houston. The court stated: "John Muir is now on notice [that Houston has a potential recovery]. Their billing person said that they were not aware and they now are aware that there's a possible recovery from your client and the co-responsible."

After the matter had been submitted, the court stated: "[I]t seems to me that the Court is required, in the exercise of its discretion and the circumstances as a whole, as presented here at this hearing, to fashion a remedy that is taking into account the fact of the hospital having made this accounting . . . entry and also the fact that the minor must be held accountable together with the co-responsible. It seems to me that under the circumstances as a whole, the total amount that equals to 20 percent of the amount that was owing is a reasonable amount. . . ."

The court set restitution at 20 percent of $412,546.89 with a credit of $1,000 for the amount that Anthony had already paid to the victim restitution fund. The final restitution order was for $81,509.38, for which Anthony and his parents were jointly and severally liable.[3]

Anthony timely filed a notice of appeal on October 24, 2013.

## DISCUSSION

"Generally speaking, restitution awards are vested in the trial court's discretion and will be disturbed on appeal only where an abuse of discretion appears." (*In re K.F.*

---

[3] The restitution order applied only to Anthony and not to the co-defendant because the co-defendant was not before the court. The court directed the probation department "to get [the co-defendant's] case on calendar after notice to [co-defendant] so that restitution is scheduled in his case."

(2009) 173 Cal.App.4th 655, 661 (*K.F.*).) "If there is no substantial evidence to support the award, and assuming no other rational explanation, the trial court will have obviously abused its discretion." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 993.) Here, Anthony maintains that the restitution order was not authorized by section 730.6 and that there was insufficient evidence that Houston incurred any economic loss. These are essentially the same argument because without substantial evidence that Houston incurred an economic loss, a restitution order is not authorized by section 730.6. Accordingly, we consider whether substantial evidence supported a finding that Houston incurred any economic loss. We note that the parties cite no previous case concerning restitution under section 730.6 in which the medical charges to the victim have been billed, but written off by the provider as uncollectable debt, nor have we found any.

Section 730.6, subdivision (a), provides, in relevant part: "It is the intent of the legislature that a victim of conduct for which a minor is found to be a person described in Section 602 who incurs any economic loss as a result of the minor's conduct shall receive restitution directly from that minor." Subdivision (h) of the same section provides, in relevant part: "Restitution . . . shall be imposed in the amount of the losses, as determined. . . . The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record. . . . A restitution order . . . shall be of a dollar amount sufficient to fully reimburse the victim . . . for all determined economic losses incurred as the result of the minor's conduct for which the minor was found to be a person described in Section 602, including all of the following: [¶] . . . [¶] (2) Medical expenses."

Three purposes underlie the imposition of a restitution order in a juvenile case: "to rehabilitate the defendant, deter future delinquent behavior, and make the victim whole by compensating him for his economic losses." (*In re Anthony M.* (2007) 156 Cal.App.4th 1010, 1017 (*Anthony M.*).) The victim's economic loss is to be calculated "without regard to potential reimbursement from a third party insurer." (*Ibid.*; *In re Brittany L.* (2002) 99 Cal.App.4th 1381, 1389.) "Similarly, it has been held that a victim whose medical treatment was covered by Medicare/Medi-Cal is entitled to restitution for

5

the total costs that had been charged to his Medi-Cal file." (*In re Eric S.* (2010) 183 Cal.App.4th 1560, 1564 (*Eric S.*).) "[T]he fortuity that the victim here was over age 65, and thus covered by Medicare, should not shield defendant from a restitution order which requires him to pay the full amount of the losses caused by his crime. . . . [¶] We therefore find the restitution order proper, even though the victim had no direct economic losses, and even though the victim could conceivably profit from recovering restitution if defendant complies with the restitution order and if Medicare and/or Medi-Cal does not pursue reimbursement." (*People v. Hove* (1999) 76 Cal.App.4th 1266, 1272-1273 (*Hove*).)

In *Eric S.*, the victim was a member of Kaiser California North, an HMO " 'providing medical services to its members rather than a medical service provider with a conventional creditor-debtor relationship to its patients.' " (*Eric S.*, *supra*, 183 Cal.App.4th at p. 1565.) Division Five of this court concluded that "[a]ssuming the victim was not obligated to pay Kaiser for any amount above his membership fee in the HMO, charges were nonetheless incurred on his behalf as a result of appellant's criminal conduct. The fortuity that the victim had purchased membership in an HMO, like the fortuity that a victim has purchased third party insurance [citation], or the fortuity that a victim is covered by . . . Medicare/Medi-Cal [citation], should not shield appellant from paying restitution for the medical expenses in this case." (*Ibid*.) The district attorney had submitted documentation from Kaiser's collection agency indicating that Kaiser would accept an amount reduced for capitated charges in satisfaction of a lien, apparently entered against any recovery the victim might obtain. (*Id.* at p. 1563.) The court concluded that restitution should be set according to the amount that Kaiser was willing to accept for the services it rendered.[4] (*Id.* at p. 1566.)

---

[4] Anthony argues that under *Eric S.*, restitution was not authorized because "John Muir . . . ultimately decided to accept no money as payment in full. The hospital chose to accept the tax write-off as payment and close the account. There is nothing to reimburse." Nothing in the record indicates that John Muir accepted a zero sum as "payment in full." To account for a debt as uncollectable does not mean that zero is regarded as payment in full, releasing the debt. Moreover, nothing in the record indicates

6

In *Anthony M.*, the court considered whether the juvenile court could impose restitution in excess of the amount paid to the medical provider by Medi-Cal. (*Anthony M.*, *supra*, 156 Cal.App.4th at p. 1013.) The court noted that "[b]y law, if a medical provider accepts payment from Medi-Cal for medical services rendered, it is barred from seeking any unpaid balance from the patient [citations], although Medi-Cal may seek reimbursement from the patient or other responsible party for the amount it paid to the provider. [Citation.]" (*Id.* at p. 1014.) The court held that the victim was liable only for the amount expended by Medi-Cal and that the juvenile court erred by ordering restitution in excess "of the actual amount expended or incurred." (*Ibid.*)

The *K.F.* court, considering what it means for the victim to incur a charge by a medical provider, wrote: "*Anthony M.* is best understood as resting on the conclusion that because the service provider was *barred* from recovering the cost of services from the victim, the victim could not be found to have 'incurred' those costs for purposes of a criminal restitution order. [Citation.] . . . To 'incur' is 'to become liable or subject to: bring down upon oneself.' (Webster's 10th Collegiate Dict. (1999) p. 590.) To constitute evidence of a 'loss incurred,' there must be some basis to conclude that the victim is 'liable or subject to' a charge. Where collection of the charge is barred by law, the victim is not liable or subject to it, and the charge is not 'incurred.' This rationale has no application here, where no such legal bar to recovery appears." (*K.F.*, *supra*, 173 Cal.App.4th at pp. 662-663.)

K.F.'s challenge to the restitution order focused "on two amounts that were included in the restitution order: $17,261.53 associated with services rendered by 'Kaiser,' and $583.32 associated with 'Kaiser Ambulance Service.' " (*K.F.*, *supra*, 173 Cal.App.4th at p. 662.) The *K.F.* court found that only one of the challenged documents constituted substantial evidence that the sum recited reflected charges incurred by the victim. (*Id.* at p. 663.) The first document was a letter from Kaiser's collection agency

that if John Muir accepts payment, from whatever source, on Houston's bill, it could not account in its tax filings for the benefit it had previously received for writing off the debt.

stating: " 'The purpose of this letter is to serve as . . . formal notice to you that in the event you receive settlement from an insurance carrier or other party, the plan may have a right of reimbursement for medical services provided. [¶] For your convenience, we have enclosed a Consolidated Statement of Benefits with the total provided benefits to date.' " (*Ibid.*) The statement enclosed with the letter showed total benefits provided at $17,261.53 and nothing received. (*Ibid.*) The court concluded: "On its face this document reflects 'billed charges' the specified amount. It therefore constitutes substantial evidence that these charges were 'incurred' by the victim. Assuming it was not itself a bill, as defendant asserts, it was nonetheless evidence of billing. It could be reasonably viewed by the trial court as evidence that the victim had been billed for the amount stated."[5] (*Ibid.*)

Anthony, relying on *K.F.*, argues that Houston is not liable or subject to the charges from John Muir. We disagree. The billing statement from John Muir was addressed to Houston and is substantial evidence that he incurred the charges stated. That the billed amount was the true value of the services provided to Houston was not disputed at the hearing to set restitution. Despite evidence that John Muir had written off the charges to Houston as uncollectable debt, and despite evidence that seeking to collect on such debts was not the "general" practice of the hospital, there was no evidence that John Muir had released Houston from the debt in such a way that collection would be barred by law.

Anthony argues that "[t]he hospital stated unequivocally that it has chosen to take the tax write-off instead of pursuing re-payment." That is true, but it does not establish that John Muir is barred from pursuing reimbursement. As the juvenile court observed, John Muir is now on notice of a potential restitution order and, presumably, free to seek

---

[5] The other document in *K.F.* was a separate " 'Explanation of Benefits' " from Kaiser reflecting the value of ambulance service provided to the victim. (*K.F.*, *supra*, 173 Cal.App.4th at p. 664.) The document stated that it was not a bill and also stated that the victim's obligation was " '0.00.' " (*Ibid.*) The court concluded that this was "not substantial evidence that the victim *incurred* a debt or loss in that amount, or any amount. On the contrary, it explicitly shows an incurred loss of zero." (*Ibid.*)

reimbursement from any restitution paid. Indeed, Blythe testified that "if the ability to recover the debt presented itself, settlement options or ability or transparency on someone hitting the lottery, then [John Muir] would accept that recovery." Although Blythe testified that John Muir "generally do[es] not go back and look for other methods of reimbursement" after the account balance is written off, he did not testify that the hospital *never* does so, or that the hospital *would not* do so in this case. Nor did he testify that John Muir would now proactively assert its rights by filing a lien on reimbursement paid by Anthony.

As in *Eric S.*, Houston incurred charges as a result of Anthony's criminal conduct. As in *Eric S.*, the fortuity that Houston was indigent and John Muir had decided to write off the amount owed as an uncollectable debt should not shield Anthony from paying restitution any more than the fortuity that the victim was a participant in an HMO or covered by Medi-Cal or third-party insurance.

Anthony addresses "fortuity" in a discussion of *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*), which he inexplicably brings up only in his reply brief. We do not find that *Howell*, which considered measures of economic loss in tort cases, adds to our analysis. It held that a tort victim suffers economic loss only to the extent that medical costs were covered by his or her insurer (or paid directly) and that "the undiscounted sum stated in the provider's bill but never paid by or on behalf of the injured person" was not a proper measure of damages. (*Id.* at p. 548.) The question before the *Howell* court is not at issue here, but that court did observe: "There is, to be sure, an element of fortuity to the compensatory damages the defendant pays under the rule we articulate here. A tortfeasor who injures a member of a managed care organization may pay less in compensation for medical expenses than one who inflicts the same injury on an uninsured person treated at a hospital . . . . We should not order one defendant to pay damages for an economic loss the plaintiff has not suffered [citations] merely because a different defendant may have to compensate a different plaintiff who *has* suffered such a loss." (*Id.* at p. 566.)

9

The type of fortuity contemplated by *Howell* is already built into section 730.6 restitution. A juvenile whose victim is covered by Medi-Cal will be liable for restitution of a smaller amount than would be the case if the victim had no coverage. In the former case, the measure of restitution will be the amount that Medi-Cal paid to the medical provider, while in the latter case the measure will be the full amount of billed services. A different kind of fortuity is contemplated in *Hove* and in *Eric S.*, where the defendants argued that they were shielded from a requirement to pay restitution at all because of particular circumstances of the victim, despite charges having been incurred as a result of their criminal conduct. *Howell* does not assist Anthony.

A restitution award is not intended to provide the victim with a windfall. (*Anthony M.*, *supra*, 156 Cal.App.4th at p. 1017.) Anthony finally suggests that restitution to Houston would be a windfall because John Muir will make no effort to collect from Houston. We disagree. Because there is no legal bar to John Muir seeking reimbursement from any restitution that Anthony pays in the future, the amount of restitution ordered by the court is not a windfall to Houston. That Houston might conceivably profit if Houston someday recovers on the restitution and if John Muir fails to exercise its right to recover, does not make the restitution award a windfall. (See *Hove*, *supra*, 76 Cal.App.4th at pp. 1272-1273.)

We conclude that even though John Muir chose not to pursue Houston for the charges billed to him on account of medical services received, in the absence of a legal bar preventing John Muir from collecting in the future, or an unequivocal statement from John Muir that it would not exercise its rights, it was not contrary to section 730.6 for the court to base restitution on the billed charges, which were established by substantial evidence.

**DISPOSITION**

The juvenile court's restitution order is affirmed.

 

_____

Brick, J.*

We concur:

_____

Kline, P.J.

_____

Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11

Trial Court:  Superior Court of Contra Costa County


Trial Judge:  Hon. Barry Baskin


Attorney for Defendant and Appellant     Melanie Martin Del Campo

By Appointment of the Court of Appeal under the First District Appellate Project Case Management System


Attorneys for Plaintiff and Respondent

Kamala D. Harris
Attorney General
Dane R. Gillette
Chief Assistant Attorney General
Gerald A. Engler
Senior Assistant Attorney General
Eric D. Share
Supervising Deputy Attorney General
Sharon G. Birenbaum
Deputy Attorney General