Filed 2/27/15  Varela v. Birdi CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GABRIEL VARELA et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>MONINDER BIRDI et al.,<br><br>Defendants and Appellants. | D064315 & D065631<br><br><br>(Super. Ct. No. 37-2012-00090344-CU-PA-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.

Horvitz & Levy, Robert H. Wright, Steven S. Fleischman; Willis Depasquale, Larry N. Willis and Shane M. Biornstad for Defendants and Appellants, Moninder Birdi and Moninder Birdi & Associates.

Gentes & Associates, Stephen A. Gentes and Sarah E. Risso for Defendant and Appellant Monider Birdi.

Law Offices of Robert Hamparyan, Robert N. Hamparyan; Law Office of Kane Handel, Kane Handel; Williams Iagmin and Jon R. Williams for Plaintiffs and Respondents.

## INTRODUCTION

Moninder Birdi and Birdi & Associates appeal a judgment after a jury verdict in favor of Gabriel and Bernice Varela for damages sustained when Birdi drove his vehicle into the path of Varela's oncoming bicycle at an intersection in the Point Loma area of San Diego.  Birdi contends (1) the court failed to properly instruct the jury regarding the speed limit for the street on which Varela was traveling and (2) the court erred in allowing evidence of future medical expenses without consideration of what Varela's insurer may pay for such future expenses.  We disagree with both contentions and affirm the judgment.  We conclude, under the circumstances of this case, the court properly instructed the jury regarding the basic speed law and negligence.  We further conclude the trial court properly applied the collateral source rule to exclude evidence of the amounts Varela's insurer may pay for future medical expenses.  Given our conclusion, we also affirm the order awarding the Varelas their costs and expert witness fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

Varela, who had just been selected to serve as the Commander of a Navy missile destroyer ship after rising through the ranks over his 26-year Navy career, was riding his bicycle home from work at the Naval base on the evening of February 8, 2010, when Birdi drove his vehicle into an intersection directly into Varela's path of travel.  Varela

hit the front end of the vehicle on the driver's side, he flew up and landed on the ground in the middle of the intersection. Varela suffered significant injuries. The parties stipulated Birdi was "negligent in the operation of his vehicle in failing to see [Varela]," "Birdi violated [Varela's] right of way under the law" and Birdi was "one of the causes of the collision."[1] However, Birdi asserted Varela was comparatively negligent based on Varela's speed and inattention prior to entering the intersection.

B

The collision occurred in a two-way controlled intersection of Catalina Boulevard and Orchard Avenue. Birdi, who was traveling west on Orchard Avenue, had a stop sign. Varela, who was riding north on Catalina Boulevard, had no traffic controls at the intersection because Catalina Boulevard is a through roadway. Varela had the right-of-way.

Jeremy Gomez, who was driving northbound in stop-and-go traffic on Catalina Boulevard on the evening of the accident, noticed Varela riding his bike on the right hand side of the road. Varela was wearing a white and blue rider's uniform matching his helmet and bicycle. Varela passed him when traffic slowed or stopped, but Gomez would pass Varela when traffic picked up. Based on Gomez's own cycling experience, he felt Varela was "following the rules of the road." Gomez saw Varela enter the intersection when a vehicle "blew through" the stop sign on Orchard Avenue into

---

1    The parties also stipulated Birdi's company, Birdi & Associates, is responsible for any harm caused by Birdi because he was operating his vehicle in the course and scope of his employment.

3

Varela's path of travel. Varela struck the front end of the vehicle on the driver's side and flew off his bicycle into the intersection.

Aron Galvan also noticed Varela riding to the right of traffic on Catalina Boulevard as she left work at the Naval base. She noticed him because he was wearing a blue and gold biker outfit. Due to traffic, sometimes Varela would be in front of her and at other times, he would be behind her. Galvan estimated she and Varela had been traveling at 35 to 40 miles per hour before the collision occurred. Galvan estimated the speed limit was 30 to 35 miles per hour. There was a school nearby and a sign requiring 25 miles per hour when the light is flashing. Galvan did not remember seeing the light flashing that day.

Christopher Davis said he was traveling about 30 miles per hour and was slowing down when he first saw Varela on the side of the road in his right rear-view mirror after Davis saw a child running along the left side of the road. Varela was wearing a blue uniform. Visibility was very good. Davis noticed Varela pedaling rapidly. He believed Varela was traveling 40 miles per hour when he first noticed him. However, he stated he was not good at providing speed and distance estimates. He also thought the speed limit on Catalina Boulevard was 45 miles per hour.

As Davis nosed his vehicle into the intersection, he saw Birdi's vehicle enter the intersection and start to accelerate across just as the bicycle was about to pass Davis. He did not see Birdi's vehicle stop and he did not think either the vehicle or the bicycle were paying attention to the other. Davis saw the bicycle hit the driver side of the vehicle.

4

C

Birdi was renting a home in Point Loma at which to stay during the workweek because his business was providing consulting for the San Diego International Airport at Lindbergh Field. He was familiar with the intersection where the collision occurred. He knew he had a stop sign on Orchard Avenue. He knew there were no traffic controls on Catalina Boulevard. He also knew he had to yield the right-of-way to oncoming traffic on Catalina Boulevard.

After leaving work, Birdi drove about 15 minutes until he got to the intersection of Orchard Avenue and Catalina Boulevard. As he drove, he spoke on his cellular phone with various individuals from his office. Birdi testified he was on a call a block from the scene of the collision, but claimed to have finished the call before he reached the intersection. He denied he was using the phone at the time of the accident. Birdi's cellular phone records showed three calls to and from his office before the collision, including a dropped call and attempts by a person from his office to call back at the time of the collision.

Birdi testified he stopped at the intersection of Orchard Avenue and Catalina Boulevard and looked both ways before proceeding into the intersection. He thought traffic was clear when he proceeded into the intersection.

Birdi told the investigating officer he was "surprised" when he felt an impact on the side of his vehicle and a bicyclist hit the driver door of his vehicle. He stated he did not see Varela, or any vehicles or bicycles, before he drove into the intersection.

5

D

Officer Michael Gottfried, an experienced traffic investigator with the San Diego Police Department, was the primary investigator for the collision. Officer Gottfried interviewed Birdi and other witnesses and photographed, measured, and documented the collision scene to determine the cause of the collision.

According to Officer Gottfried, Birdi would have had an unobstructed line of sight of over 1,000 feet in Varela's direction and should have seen Varela when he looked to his left at the stop limit line on Orchard Avenue. Officer Gottfried concluded Birdi caused the collision by failing to yield the right-of-way to Varela.

Officer Gottfried testified Catalina Boulevard has a speed limit of 30 miles per hour at the location of the collision. Although there is a sign stating the limit is 25 miles per hour when children are present, he determined it was not relevant to the investigation because school was not in session at the time. On cross-examination, he was shown the posted sign with the signal light on top and he was asked about the Vehicle Code section regulating school zones. Officer Gottfried testified the 25-mile-per-hour limit would not be enforceable at 5:00 p.m. when the accident occurred.

Officer Gottfried was also questioned about the witness statements placing Varela's speeds anywhere from 16 miles per hour to 40 miles per hour. Officer Gottfried estimated in his report Varela's speed was 25 to 35 miles per hour. He did not believe the bicycle could have hit the vehicle at 40 miles per hour based on his observation of the vehicle and his experience and training. Officer Gottfried also stated the bicycle speed did not impact his analysis of who had the right-of-way or who was at fault for the

6

accident because Birdi clearly violated Varela's right-of-way. Varela's speed was not great enough to change the right-of-way violation.

The Varelas' expert, Eugene Vanderpol, agreed. Based on accident reconstruction, Vanderpol concluded Birdi was at fault for not paying attention, for not seeing Varela who should have been visible, and for not stopping at the stop sign. Vanderpol estimated Varela was traveling below the 25 or 30-mile-per-hour speed limit for several hundred feet before the accident based on the damage to the vehicle, the bicycle and Varela's injuries.

Birdi's accident reconstruction expert, Gerald Bretting, is an avid cyclist with racing experience. He conducted an experiment by riding the route Varela took three times to determine if the estimates Varela was traveling 35 to 40 miles per hour were realistic. During those ride-throughs, while "working pretty hard," he achieved speeds of up to 37 miles per hour on the down slope for a few seconds and reduced speeds of 33 to 34 miles per hour as he approached the intersection. Bretting used a high-end road bicycle weighing approximately 18 pounds for the road tests whereas Varela had an entry-level road bicycle weighing about 28 pounds.

Based on his own road tests, Bretting prepared animated reconstructions assuming Varela was traveling at maximum speed of 37 miles per hour decelerating to 33 or 34 miles per hour as he passed Davis approaching the intersection and then 20 to 25 miles per hour at impact after a brief application of the brakes. In Bretting's opinion, if Varela was traveling slower as he approached the intersection, he may have had

7

sufficient time to avoid the accident or reduce the impact speed of the collision to five-to-seven miles per hour.

Bretting noted the posted speed limits were 30 miles per hour in some areas, 35 miles per hour in other areas and 25 miles per hour near the school when children were present. Bretting thought a childcare location was across the street was open until 6:00 p.m., but did not offer an opinion regarding the enforceable speed limit at the time of the accident. He testified his estimates of Varela's speed would have placed Varela in excess of the speed limit if it was either 25 or 30 miles per hour.

E

Varela sustained significant and multiple injuries including a concussion, upper and lower lip lacerations, a fracture of his right hip, a fracture of his right thighbone and a sprain with a meniscal tear in the right knee. He underwent six surgeries to repair his femur, hip, lips and right knee as well as scar revision procedures. He developed pain on the left side of his head, headaches, chronic pain disorder and sleep disorder due to chronic pain. Due to his perseverance and dedication, Varela recovered to the point he was able to report to duty and assumed his positions as the Executive Officer and then as Commander of a Navy missile destroyer ship.

However, the jury heard evidence Varela suffers chronic pain in the occipital region of his head as well as in the hip, thigh, knee and lower lip. He will require future medical care including surgeries for knee replacement, removal of the plates and screws in his hip, removal of the rod in his right femur and possibly hip replacement. To control Varela's pain, pain specialists recommend a regimen of medications for the rest of his life

8

as well as other possible therapies including steroidal injections, radiofrequency ablation of the nerve branch, nerve stimulation and/or neurectomy to treat the chronic occipital pain.

Varela did not seek compensatory damages for past medical expenses. Instead, Varela presented evidence from medical experts regarding the future medical care he will require along with estimated costs for the future care. An economist compiled the anticipated costs and calculated the present value of the future cost of medical care would be approximately $1.8 million.

F

The jury returned a verdict finding Birdi solely negligent and a substantial factor in causing harm to Varela. The jury awarded: (1) $1,355,598 for future medical expenses; (2) $405,801 for future loss of earnings; (3) $800,000 for past noneconomic loss; and (4) $2.2 million for future non-economic loss. The jury awarded Varela's wife $14,000 for her loss of consortium claim.

Birdi moved for new trial asserting, among other things, instructional error based on the refusal to give CACI No. 707 regarding the prima facie speed law and excessive future economic damages claiming the damages should be reduced to amounts likely to be paid by Varela's insurer. Birdi proposed showing this amount by comparing the differential between the amounts billed and amounts paid for Varela's past medical expenses. Birdi sought a remittitur awarding Varela one-third of the amount of damages awarded by the jury purportedly based on a comparison of the amounts billed and the amounts paid for past medical expenses. The court denied the motion.

9

G

The court awarded Varela $616,053.26 in costs as the prevailing party and expert witness fees under Code of Civil Procedure section 998.

DISCUSSION

I

*Jury Instructions*

Birdi contends the court committed prejudicial error by declining to instruct the jury with CACI No. 707 regarding the prima facie speed limit and instructing only with CACI No. 706 regarding the basic speed law.  We are not persuaded.

A

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)  However, " '[i]nstructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law.  [Citations.]  Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition.  [Citations.]'  [Citation.]  Finally, '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' "  (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

"We independently review claims of instructional error viewing the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.) " 'The refusal of a proper instruction is prejudicial error only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" [Citation.] "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." ' " (*Ibid.*)

B

Birdi based his comparative fault defense in large part on Varela's speed on Catalina Boulevard asserting the speed limit was 25 miles per hour and Varela was traveling faster than that limit when he approached the intersection. Birdi offered two modified versions of CACI No. 707, one stating the speed limit where the accident occurred was 25 miles per hour and the other stating the speed limit is 30 miles per hour in the area unless certain conditions existed, in which case it would be 25 miles per hour.[2] Varela initially requested a version of CACI No. 707 stating the speed limit was 30 miles per hour, but later withdrew the request.

---

[2] Birdi's second modified version is as follows: "The posted speed limit on Catalina Blvd. between Chatsworth Blvd. and Orchard Avenue is 30 miles per hour unless the following conditions existed at the time of the accident: [Varela] was approaching, at a distance of 500 to 1,000 feet from, a school building or the grounds thereof, contiguous to a highway and posted with a school warning sign that indicates a speed limit of 25 miles per hour, while children were going to or leaving the school, either during school hours or during the noon recess period. [¶] If these conditions were present, the speed limit

11

The evidence regarding Birdi's request for an instruction regarding a 25-mile-per-hour speed limit was not clear. Officer Gottfried testified the applicable speed limit was 30 miles per hour at the time of the accident and the 25-mile-per-hour limit for a school zone was irrelevant because it would not be enforceable after school hours. One witness stated the school zone sign flashes when the 25-mile-per-hour limit applies and she did not recall seeing it flashing that evening.

Birdi's accident reconstruction expert Bretting testified to various speed limit signs in the area, including the school zone sign. He recalled testimony from one of the witnesses about seeing a child on the street and thought a childcare facility nearby had hours until 6:00 p.m. However, he did not offer an opinion regarding the applicable speed limit. Instead, based on Bretting's estimate of Varela's speed, he testified Varela would have exceeded the speed limit if it was either 25 or 30 miles per hour.

After considering the proposed instructions and the evidence, the court determined there was no reliable evidence to support an inference the speed limit was 25 miles per hour. Instead, the court gave the instruction for the basic speed law (CACI No. 706) along with CACI No. 700 for the basic standard of care for operation of a vehicle.[3] The

_____

was 25 miles per hour. [¶] The speed limit is a factor to consider when you decide whether or not [Varela] was negligent. A driver is not necessarily negligent just because he or she was driving faster than the speed limit. However, a driver may be negligent even if he or she was driving at or below the speed limit."

[3] The jury was given the modified version of CACI No. 700 regarding the basic standard of care as applied to Varela was as follows: "A person must also use reasonable care in riding a bicycle. Bicycle riders must keep a lookout for pedestrians, obstacles,

12

court explained the ruling stating, "[H]ere's what I see. And . . . why I think it would be better to give [CACI No.] 700 instead of [CACI No.] 707 because it's my opinion that even though an inference is—your argument . . . was that an inference could be drawn that the speed limit was 25 miles an hour, but that has to be based on reliable evidence. I didn't find any reliable evidence that would support it, and so I was inclined to just strike the 25-mile-per-hour instruction altogether. [¶] But I think that it is for the jury to be able to listen to all of the evidence and your argument and make a determination, and that's why I think [CACI No.] 700 covers it better for both parties."

Birdi cites no cases requiring an instruction regarding a prima facie speed limit where (1) there was insufficient evidence to support an instruction regarding the speed limit requested by a party and (2) the court instructed the jury regarding both the basic speed law and the standard of care for negligence in operating a vehicle.

In *Hardin v. San Jose City Lines, Inc.* (1953) 41 Cal.2d 432, 438-440, the court instructed the jury about both the basic speed law and the prima facie speed limit where there was evidence a bus on which the plaintiff was injured was traveling in excess of the posted speed limit in a medium amount of traffic when it came to a sudden stop. The

---

and other vehicles. They must also control the speed and movement of their bicycles. The failure to use reasonable care in riding a bicycle is negligence."

The jury was also given the modified version of CACI No. 706 regarding the basic speed law as applied to Varela as follows: "A person also must ride his bicycle at a reasonable speed. Whether a particular speed is reasonable depends on the circumstances such as traffic, weather, visibility, and road conditions. Bicycle riders must not drive so fast that they create a danger to people or property. [¶] If [Birdi] has proved [Varela] was not riding his bicycle at a reasonable speed at the time of the accident, then [Varela] was negligent."

13

court stated it is proper in a civil case "to give an instruction on the prima facie speed limit even though proof of speed in excess of that limit is not enough, standing alone, to show that the vehicle was being operated negligently." (*Id*. at p. 439.) The court discussed former Vehicle Code section 513 (predecessor statute to Veh. Code, § 40831), stating proof of speed in excess of a prima facie speed limit in a civil case does not establish negligence as a matter of law and it is necessary to establish as a fact that " 'such excess speed' " constituted negligence. The court concluded, since "[t]he words 'such excess speed' clearly refer to an excess over the prima facie limit . . . it follows that the plaintiff may introduce evidence of the prima facie speed limit in order to show that there was 'such excess speed." (*Hardin*, *supra*, at p. 439.) It was in this context the court stated, "the prima facie speed limit is a factor to be considered with other pertinent factors and that the plaintiff is entitled to an instruction thereon." (*Ibid.*) However, the court did not address a case, such as the one before us, where there was no clear evidence to support the speed limit the defendant asserted was applicable. Nor did the *Hardin* court address a situation where the court instructed the jury regarding the standard of care for negligence.

Similarly, *Beard v. David* (1960) 179 Cal.App.2d 175, 176 involved a passenger in a vehicle who sued the driver of another vehicle for injuries she sustained when the two collided in an intersection. One of the issues in the case was the speed the vehicle in which the plaintiff was riding entered the intersection. (*Id*. at p. 179.) The court instructed the jury regarding the prima facie speed limit as well as the basic speed law. (*Id*. at pp. 180-181.) At the request of the plaintiff, the court gave additional instructions

14

regarding rebuttable presumptions. (*Id*. at p. 181.) The court determined there was sufficient evidence to support a prima facie speed limit instruction even though there was no direct evidence of the posted speed limit, because a police officer testified about the speed limit in the area and there was no dispute the intersection in which the accident occurred was in a business district. (*Id*. at p. 179.) The plaintiff contended the combined instructions placed on her a burden of proving the speed of the vehicle in which she was riding was not negligent. The appellate court concluded the defendant was entitled to the prima facie speed limit instruction even though proof of excess speed alone is not proof of negligence and any confusion regarding the combined instructions arose from instructions requested by the plaintiff. (*Id*. at pp. 181-182.)

In *Hodges v. Severns* (1962) 201 Cal.App.2d 99, 110-111 the trial court refused to instruct the jury regarding either the prima facie speed limit for the area where the accident occurred or the basic speed law. Instead, the court gave an instruction regarding a rebuttable presumption of negligence for violation of the Vehicle Code and general duty instructions. The appellate court concluded this was error because the jury was left with no knowledge of the basic speed law or guidance as to how to evaluate the evidence in the case.

In this case, the jury had ample guidance to evaluate the evidence. They were instructed regarding the basic speed law as well as the standard of care for negligence in operation of a vehicle, both of which required the jury to consider Varela's speed and gave the jury the opportunity to find Varela comparatively negligent under the circumstances even if he was riding under the applicable speed limit. Birdi's counsel was

15

permitted to examine witnesses regarding the speed limit and to show the speed limit sign. Birdi's counsel asked the jury to take the speed limit, including signage, into account in evaluating whether Varela was comparatively negligent. Under these circumstances, we cannot conclude the court erred in declining to give Birdi's requested instruction regarding the prima facie speed limit.

## II

### *Evidence Regarding Future Medical Costs*

Birdi contends the holdings of *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541(*Howell*) and *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*) require a plaintiff asserting a claim for damages in the form of future medical expenses to limit the amount sought to that which may be paid by the plaintiff's insurance rather than amounts anticipated to be billed by medical providers. Relying on these authorities, Birdi contends the trial court erred in admitting evidence of Varela's future care costs and in applying the collateral source rule to preclude Birdi from examining witnesses regarding what the future care costs would be if they were obtained using Varela's military insurance. As we shall explain, we are not persuaded the rationale articulated in *Howell* and *Corenbaum* applies to future medical care estimates.

### A

### *Standard of Review*

We review evidentiary rulings made in limine or during trial for abuse of discretion. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) " 'While trial judges ordinarily enjoy broad discretion with respect to the

16

admission and exclusion of evidence . . . , a court's discretion is limited by the legal principles applicable to the case.' [Citation.] 'Thus, if the trial court's . . . ruling was based on a misinterpretation of applicable law, an abuse of discretion has been shown.' " (*McIntyre v. The Colonies-Pacific, LLC* (2014) 228 Cal.App.4th 664, 670.)

B

*Overview of Collateral Source Rule*

California has long adhered to the collateral source rule, which provides "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern California Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 (*Helfend*).) It applies to payments made by insurers and through social legislative benefits. (Rest.2d Torts, § 920A, com. c, p. 515.)

In *Helfend*, the Supreme Court explained the collateral source rule "embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence." (*Helfend*, *supra*, 2 Cal.3d at pp. 9-10.) The court observed "in the context of the entire American approach to the law of torts and damages, . . . the rule presently performs a number of legitimate and even indispensable functions." (*Id*. at p. 13.)

Among those indispensable functions is the primary goal of fully compensating tort victims for their injuries. The *Helfend* court noted insurance policies frequently

17

require subrogation or refund of insurance benefits after a tort recovery, so the plaintiff does not receive double recovery. (*Helfend*, *supra*, 2 Cal.3d at pp.10-11.) Additionally, "generally the jury is not informed that plaintiff's attorney will receive a large portion of the plaintiff's recovery in contingent fees . . . . Hence, the plaintiff rarely actually receives full compensation for his injuries as computed by the jury. The collateral source rule partially serves to compensate for the attorney's share and does not actually render 'double recovery' for the plaintiff." (*Id*. at p. 12.) Rather, the plaintiff's ability to recover his medical expenses from both the tortfeasor and his insurance plan "partially provides a somewhat closer approximation to full compensation for his injuries." (*Id*. at pp. 12-13.)

Additionally, the *Helfend* court emphasized the importance of the evidentiary aspect of the collateral source rule. "To permit the defendant to tell the jury that the plaintiff has been recompensed by a collateral source for his medical costs might irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the normal jury verdict." (*Helfend*, *supra*, 2 Cal.3d at pp. 11-12.)

C

*Howell and Corenbaum*

In *Howell*, *supra*, 52 Cal.4th at page 566, the Supreme Court determined, for *past* medical expenses, "an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." The court explained it was not abrogating or modifying the collateral source rule, it simply found it inapplicable.

18

"The rule . . . has no bearing on amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment.  Such sums are not damages the plaintiff would otherwise have collected from the defendant.  They are neither paid to the providers on the plaintiff's behalf nor paid to the plaintiff in indemnity of his or her expenses.  Because they do not represent an economic loss for the plaintiff, they are not recoverable in the first instance."  (*Howell*, *supra*, 52 Cal.4th at p. 548-549.)  If a provider accepted less than the full amount billed, the full amount billed is not relevant to the issue of damages.  (*Id.* at p. 567.)

*Howell* affirmed the vitality of the evidentiary aspect of the collateral source rule stating evidence that "payments were made in whole or in part by an insurer remains . . . generally inadmissible."  (*Howell*, *supra*, 52 Cal.4th at 567.)  However, the court expressed "no opinion as to its relevance or admissibility [of the full billed amount] on other issues, such as noneconomic damages or future medical expenses."  (*Ibid*.)

The court in *Corenbaum*, *supra*, 215 Cal.App.4th 1308 followed *Howell, supra*, 52 Cal.4th 541 and held evidence of "the full amount billed for a plaintiff's medical care is not relevant to the determination of a plaintiff's damages for past medical expenses, and therefore is inadmissible for that purpose" whereas "evidence of the amount accepted by medical providers as full payment does not violate the collateral source rule and is admissible *provided that the source of payment is not disclosed to the jury and the evidence satisfies the other rules of evidence*."  (*Corenbaum*, at p. 1328, italics added.)

Addressing some of issues left open by *Howell*, *supra,* 52 Cal.4th 541 the *Corenbaum* court concluded the full amount billed for *past* medical services is not relevant to the determination of damages for *future* medical expenses and cannot support expert opinion regarding the reasonable value of future medical expenses. (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1330-1331.) "[F]or a jury to consider both evidence of the amount accepted as full payment, for the purpose of determining the amount of past economic damages, and the full amount billed, for some other purpose, would most certainly cause jury confusion and suggest the existence of a collateral source payment, contrary to the evidentiary aspect of the collateral source rule." (*Id.* at p. 1331.) Similarly, "for an expert to base an opinion as to the reasonable value of future medical services, in whole or in part, on the full amount billed for past medical services provided to a plaintiff would lead to the introduction of evidence concerning the circumstances by which a lower price was negotiated with that plaintiff's health insurer, thus violating the evidentiary aspect of the collateral source rule." (*Id*. at p. 1332.)

The court also determined evidence of the full amount billed for past medical expenses is irrelevant to the jury's consideration of noneconomic damages. (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1332-1333.) The court concluded there was no justification for admitting otherwise inadmissible evidence for the purpose of "providing plaintiff's counsel an argumentative construct to assist a jury in its difficult task of determining the amount of noneconomic damages." (*Id*. at p. 1333.)

D

*Procedural Background and Evidence of Future Medical Costs*

In this case, relying on *Howell*, *supra*, 52 Cal.4th 541 Birdi moved in limine to exclude evidence regarding the amount of medical bills in excess of the amount paid by Varela's insurer for his past medical expenses. Varela's counsel did not dispute the application of *Howell* to the claims for *past* medical expenses, but argued evidence of the full amount billed for past medical expenses should come into evidence for the issues of noneconomic and future medical care costs. The court granted the defense motion precluding introduction of evidence regarding billed amounts for past medical expenses. *Corenbaum*, *supra*, 215 Cal.App.4th 1308 was decided the following day. Ultimately, Varela did not seek damages for past medical expenses, only damages for future medical expenses.

About a week after *Corenbaum* was decided, in discussing a chart submitted by Varela's economic expert regarding future medical costs, Birdi's counsel cited *Corenbaum*, *supra*, 215 Cal.App.4th 1308 and *Howell*, *supra*, 52 Cal.4th 541 and argued the chart for future medical expenses should be based on amounts that would be payable under Varela's military insurance. Varela's counsel argued *Corenbaum* was not applicable and evidence regarding what insurance would pay is speculative and violates the collateral source rule. The court stated its belief *Corenbaum* does not stand for the proposition future medical costs must be based on insurance rates. Additionally, the court considered the amount an insurer would pay in the future to be speculative and would preclude Varela from seeking medical care outside of his plan.

21

During cross-examination of Varela's expert orthopedist, who testified regarding future care costs, counsel for Birdi asked how much the proposed procedures would cost at the Naval hospital. The court sustained Varela's objection on the basis the question violated the collateral source rule because it called for the witness to talk about insurance. The court later confirmed it did not find *Corenbaum*, *supra*, 215 Cal.App.4th 1308 applicable to future medical expenses and questions regarding the cost of care at the Naval hospital were not only collateral source, but also irrelevant because Varela should be able to choose whether or not to go to the Naval hospital for care.

When Varela's pain management expert testified regarding the anticipated costs of future medical care to manage Varela's chronic pain, Birdi asserted a foundational objection based on *Corenbaum*, *supra*, 215 Cal.App.4th 1308, which the court overruled. In a conference outside the presence of the jury, the court noted a prior witness had commented Varela would incur no cost for dental implant surgery if he received care through the Navy. The court again cautioned the parties against such comments reflecting collateral source. The court granted Birdi a standing objection based on *Corenbaum*.

Varela's economist prepared a chart regarding future medical expenses based on the cost estimates presented by the expert medical witnesses. The present value of the total future medical costs claimed was $1,823,649.

Birdi's orthopedic expert presented the jury with substantially lower estimates for certain medical procedures than those presented by Varela's expert ($18,000 for removal of hip hardware and physical therapy versus $53,000; $30,000-$50,000 for knee

22

replacement versus $125,000). Birdi's pain management expert did not express a counter opinion to the costs estimated by Varela's pain management expert other than to suggest a surgical procedure to attempt to cure Varela's chronic head pain at a rate of $10,000.

E

*Analysis*

Assuming the cost estimates provided by Varela's medical experts were based on amounts providers typically charged rather than amounts typically received through insurance or other payment schemes, we do not agree *Howell*, *supra*, 52 Cal.4th 541 and *Corenbaum*, *supra*, 215 Cal.App.4th 1308 compel the conclusion such charged fees should be inadmissible for the purpose of evaluating future medical expenses.[4]

The Supreme Court in *Howell* was presented with known quantities: the total amounts billed up to the time of trial and the amounts accepted by the medical providers based on agreements between the provider and the insurer. (*Howell*, *supra*, 52 Cal.4th at pp. 549-550.) The *Howell* court was concerned with identifying an accurate measure of reasonable compensatory damages for *past* medical expenses. It concluded "an injured

---

[4]     Birdi assumes the costs are based on amounts a medical provider would bill rather than costs a provider may customarily expect to receive. Based on the record before us, we are unable to determine whether Birdi's counsel asked Varela's medical experts in pre-trial discovery for the basis of their opinions regarding future medical costs. On this record, Birdi's counsel did not make an offer of proof or request an Evidence Code section 402 hearing to explore the basis of the Valerlas' medical experts' opinions regarding costs. Counsel for Varela represented the amounts were based on "the reasonable standards and the custom and practice is in the medical industry," but did not state whether the amounts were based on customary charges or customary receipts. Therefore, we are left with an incomplete record to fully analyze Birdi's contention the future care costs presented by Varela were unreasonable.

23

plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Id*. at p. 566.)  Since the negotiated discount medical providers offer to the insurer "is not a benefit provided to the plaintiff in compensation for his or her injuries" it does not fall within the collateral source rule.  (*Ibid.*)  Because the negotiated differential is not an economic loss for the plaintiff, it is not recoverable.  "The collateral source rule precludes certain deductions against otherwise recoverable damages, but does not expand the scope of economic damages to include expenses the plaintiff never incurred." (*Id.* at p. 549; accord, *Corenbaum*, *supra*, 215 Cal.App.4th at p. 1327.)

Future damages are different.  "An injured plaintiff is entitled to recover the reasonable value of medical services that are reasonably certain to be necessary in the future." (*Corenbaum*, *supra*, 215 Cal.App.4th at p. 1330.)  "However, the 'requirement of certainty . . . cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award.' " (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.)  At the time of trial, the precise medical costs a plaintiff will incur in the future are not known.  Nor is it known how a plaintiff will necessarily pay for such expenses.  It is unknown for example, what, if any, insurance a plaintiff will have at any given time or what rate an insurer will have negotiated with any given medical provider

24

for a particular service at the time and location the plaintiff will require the medical care.[5]

A policy requiring a plaintiff to present evidence of future medical expenses based only on his or her insurance plan at the time of trial would risk under-compensation for the injury inflicted by the tortfeasor. If the plaintiff were to change or lose insurance or if the negotiated rates are different at the time the medical care is necessary, an award based only on current insurance rates may very well be insufficient. It may also unnecessarily limit the plaintiff's choice for medical care.

In this case, Birdi contends Varela's military service makes him eligible for lifetime medical benefits and requires him to seek care through the military system. One of Varela's superiors testified military officers are not authorized to seek medical attention outside of the military healthcare system without notifying military authorities. We do not interpret this statement as precluding a military veteran from seeking care outside of the military system if he or she has the means to pay for such care, but rather as suggesting the military insurance program may not provide coverage for such outside care.

_____

[5] The Supreme Court in *Howell*, *supra*, 52 Cal.4th at page 560 recognized the "complexities of contemporary pricing and reimbursement patterns for medical providers." It noted the complexities of hospital charge-setting practices, the wide disparities in reimbursements based on charges to uninsured patients and those with private insurance or public medical benefits and the fact that "prices for a given service can vary tremendously . . . from hospital to hospital in California." (*Id.* at pp. 560-561.) Based on this wide variation, the court concluded, "making any broad generalization about the relationship between the value or cost of medical services and the amounts providers bill for them—other than that the relationship is not always a close one—would be perilous." (*Id.* at p. 562.)

It may be that Varela is eligible and entitled to benefits based on his service. However, as the trial court stated, if Varela does not like the provider available through the military system or if he would prefer to seek care from an outside specialist, he should have the opportunity and ability to seek such care outside of his plan. Therefore, we find no abuse of discretion in allowing Varela to put on evidence regarding reasonable estimated future medical costs without factoring in anticipated insurance benefits.

Additionally, the trial court did not abuse its discretion in precluding Birdi's counsel from questioning witnesses about how much procedures would cost at the Naval hospital. The court was correctly concerned this line of questioning would lead to discussion of military benefits and coverage in violation of the evidentiary aspect of the collateral source rule. (*Howell*, *supra*, 52 Cal.4th at pp. 563, 567 [affirming evidentiary aspect of the collateral source rule].) "The potentially prejudicial impact of evidence that a personal injury plaintiff received collateral insurance payments varies little from case to case. Even with cautionary instructions, there is substantial danger that the jurors will take the evidence into account in assessing the damages to be awarded to an injured plaintiff. Thus, introduction of the evidence on a limited admissibility theory creates the danger of circumventing the salutary policies underlying the collateral source rule." (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 732-733.)

We do not suggest, however, the defense is precluded from offering alternative estimates of future medical costs. In this case, although Birdi's economist did not offer a response to Varela's economist regarding the present value of future medical costs, Birdi's medical experts did offer opinions regarding estimated costs for certain future medical

26

expenses, which were significantly lower than the estimates provided by Varela's medical experts. The jury evaluated the evidence and came to a unanimous decision regarding the reasonable value of the future medical expenses. The jury awarded nearly half a million dollars less for future medical expenses than requested by Varela. Based on this record, we find no abuse of discretion.

III

*Appeal Regarding Award of Costs*

Birdi appealed the order awarding Varela costs and expert witness fees contending, if the judgment is reversed, Varela can no longer be considered the prevailing party and the award of costs and fees should also be reversed. Given our decision herein, this appeal is moot.

DISPOSITION

The judgment and the award of costs and fees is affirmed. Respondents shall recover their costs on appeal.

MCCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

AARON, J.

27